NEW JERSEY–PHILADELPHIA PRES-
BYTERY OF THE BIBLE PRESBYTE-
RIAN CHURCH; Shelton College, A
Ministry of Bible Presbyterian Church;
Bible Presbyterian Church of Collings-
wood, New Jersey: Kevin Wilson, Brad
Gsel, Kevin Clair Michael, Curtis Jordan
Bashaw, Louise Olson and Everette
Charles Olson, Appellants in Nos. 80–
1253 and 80–2703,

v.

NEW JERSEY STATE BOARD OF HIGH-
ER EDUCATION; T. Edward Holland-
er, Chancellor of New Jersey Depart-
ment of Higher Education; Richard D.
Breslin, Assistant Chancellor for Aca-
demic Affairs of the New Jersey Depart-
ment of Higher Education; and Amorita
Suarez, Director of the Office for Inde-
pendent Colleges and Universities of the
New Jersey Department of Higher Edu-
cation, Appellants in No. 80–1254.

Nos. 80–1253, 80–1254 and 80–2703.

United States Court of Appeals,
Third Circuit.

Argued Oct. 16, 1980.

Decided April 14, 1981.

As Amended April 22, 1981
and May 6, 1981.

John J. Degnan, Atty. Gen. of N. J., Stephen Skillman, Asst. Atty. Gen., Robert A. Fagella, Deputy Atty. Gen. (argued), Trenton, N. J., for New Jersey State Board of Higher Education, et al.

William Bentley Ball (Argued), Philip J. Murren, Kathleen A. O'Malley, Ball & Skelly, Harrisburg, Pa., C. Clark Hodgson, Jr., Georganne Daher Terrill, Silvana Moscato Brightbill, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church, et al.; Keith J. Bashaw, Keith J. Bashaw, P. A., Haddonfield, N. J., of counsel.

Before GIBBONS and ROSENN, Circuit Judges, and WEBER,* District Judge.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

We here consider cross appeals from an order of the district court granting in part and denying in part an application for preliminary injunctive relief against the enforcement of certain statutes and regulations of the State of New Jersey dealing with the licensing of private institutions of higher education.[1] The plaintiffs are Shelton College, a New Jersey corporation (Shelton), New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church, the regional ruling body of Bible Presbyterian Church, and Bible Presbyterian Church of Collingswood, New Jersey, a member of the Bible Presbyterian Church (the Churches); four full-time students at Shelton (the students); two parents of students (the parents); and Everette Charles Olson, professor of mathematics and chemistry at Shelton (the faculty member). The defendants are the New Jersey State Board of Higher Education and several individual state officials charged with the enforcement of the challenged regulations (the Board). We affirm.

I.

*Facts and Proceedings in the District Court*

As an essential part of their religious mission, the Churches, which are part of a nationwide fundamentalist Christian sect, sponsor Shelton, a small denominational institution which for several decades has been the principal source of the denomination's seminarians. Shelton owns a campus in Cape May, New Jersey. Since 1971 it also has had facilities in Cape Canaveral, Florida, and it is licensed by that state as an educational institution authorized to grant degrees. Shelton offers courses for which it charges tuition, and purports to award Bachelor degrees in the Arts, Sacred Theology, Christian Education, and Music. It accepts no local, state or federal funds because of the Churches' beliefs respecting the separation of church and state. Shelton has been a party to prior litigation with the Board.[2]

In the summer of 1979 a representative of the Board learned that Shelton intended

---

* Hon. Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. The opinion of the district court is reported. *N.J.–Phila. Presbytery v. N.J. State Bd. of Ed.,* 482 F.Supp. 968 (D.N.J.1980). The order appealed from both granted and denied a preliminary injunction. Thus we have appellate juris-

diction over both aspects of the challenged order. 28 U.S.C. § 1292(a)(1).

2. *See Shelton College v. State Bd. of Ed.* 48 N.J. 501, 226 A.2d 612 (1967); *In re Shelton College,* 109 N.J.Super. 488, 263 A.2d 810 (App.Div. 1970). *See* Section III, *infra.*

to offer courses of instruction at Cape May, and to grant degrees through its Florida affiliate. An on-site investigation at Cape May disclosed the presence of students. Since Shelton did not then hold a license from the Board, its representative informed the College's president that it was operating in violation of New Jersey law.

On November 15, 1979 the Board filed in the Superior Court of New Jersey, Chancery Division, a complaint for declaratory and injunctive relief, alleging that Shelton is offering courses of instruction for credit without the requisite license, and seeking a judgment

1. enjoining and restraining the College and its employees, servants and agents from engaging in, assisting in or causing the offering of any courses or classes of instruction, or engaging in any form of educational instruction or offering or providing any credits, awards, certificates or degrees for any such instruction or educational experience which has been given to any enrolled student or other individual in or about Cape May since September 1, 1979, until a license is issued.

2. Declaring that any operation of Shelton in New Jersey which has heretofore taken place without a license is unauthorized and contrary to law.

*See* Verified Complaint for declaratory and injunctive relief of New Jersey State Board of Higher Education, p. 4 (filed in the Superior Court of New Jersey, Chancery Division, Nov. 15, 1979). On the date the complaint was filed, the Superior Court issued a temporary restraining order enjoining all Shelton's educational or instructional activities.[3] The defendants in the Superior Court suit are Shelton's directors, and two of its officers. Neither the Churches, the students, the parents nor any faculty member are parties to that suit.

On November 19, 1979 the plaintiffs filed in the district court an action under 42 U.S.C. § 1983, alleging that the efforts of the Board to prevent Shelton's educational and instructional activities unless it complied with New Jersey's licensing scheme violated their rights to the free exercise of religion, unduly entangled the State in the affairs of a religious institution, denied their rights in education to express, transmit and receive ideas, denied their property rights and denied them equal protection of the law. They contended, moreover, that the statute and regulations the Board sought to enforce were unconstitutionally vague. The district court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction, and made findings of fact. Neither side challenges these fact findings on appeal.[4] On the basis of these findings the district court concluded:

3. A limited exception was provided in the temporary restraining order for students then enrolled, permitting them to attend until the end of the academic semester on December 22, 1979.

4. The district court found, with respect to the parents, the students, and the faculty members at Shelton, that they all shared the same theological beliefs and codes of personal conduct.

Central to their beliefs is their conviction that the Bible is The infallible, inerrant Word of God which provides guidance for every phase of life. They believe in the fallen nature of man, that by reason of his sinful nature man cannot (as the "humanist" would contend) achieve his own Utopia or salvation, that man can be saved only by the substitutionary sacrifice of Jesus and the acceptance of that sacrifice by the believer.

For these persons there are no areas of life which are not governed by their Biblical faith, whether it be their personal conduct, their vocations or the subjects they teach. Both the students and the teachers who testified believe that their presence at Shelton College is for the purpose of preparing themselves or others to perform the missions their Lord calls upon them to perform.

Several of these students could have attended recognized secular colleges and universities had they chosen to do so. The teachers work at Shelton College at considerable financial sacrifice to themselves.

When students attend Shelton College, they accept a strict code of conduct embodied in their Student Handbook (Exhibit P-1). This includes dress codes, compulsory chapel four days a week, refraining from studying, swimming, sun-bathing and athletics on Sundays, refraining from the possession or use of alcoholic beverages, tobacco, non-medicinal narcotics or hallucinogenic drugs and marijuana, and avoiding modern dance, commer-

1. that the instant suit was not barred by *res judicata*;

2. that the pendency of the Superior Court action for injunctive relief against Shelton's directors and two of its officers did not require dismissal of the federal complaint;

3. that a stay of the federal complaint pending resort to the state court for an interpretation of the challenged statute and regulations was inappropriate;

4. that a preliminary injunction should issue, enjoining the Board from taking any action having the effect of preventing Shelton, its employees, servants or agents from engaging in any religious, teaching, or educational activities or from publicizing or advertising such activities, and that the outstanding Superior Court injunction should be modified to permit such activities; and

5. that any further preliminary relief with respect to the Superior Court action should be denied.[5]

An order reflecting these conclusions was entered, and these appeals followed. The Board contends that no preliminary relief should have been granted; indeed that the complaint should have been dismissed. The plaintiffs contend that the relief which was granted inadequately protects their first amendment rights from harm pendente lite, and that the Superior Court proceedings should have been enjoined while the federal court disposed of the entire case.

## II.

### *The New Jersey Regulatory Scheme*

Prior to 1899 the State of New Jersey made no effort to regulate private higher education. In specific instances by special acts of the legislature, however, some institutions were granted charters authorizing the conferring of degrees.[6] An amendment to the New Jersey Constitution in 1875 prohibited the legislature from granting a corporate charter other than by a general law. *See* N.J.Const. Art. IV § 7 ¶ 9. Thereafter educational institutions could only be chartered under general laws such as those dealing with not for profit corporations, and religious societies. *See* N.J.S.A. 15:1–1 et seq.; 16:1–1 et seq. Since it was no longer lawful to confer degree granting authority by special charter, in 1897 a statute was

---

cial movies and rock and roll music. There is strict regulation of dating, engagements and marriage.

Every academic subject is taught from a perspective of the religious point of view of the fundamentalist denominations, whether it be history, art, economics, chemistry or English literature. The conduct and beliefs of the Shelton student and the theological doctrines which form the content of the academic program are at total variance from secular and most church-sponsored colleges and universities. This is the reason why the students have selected Shelton College, why the parents wish their students to attend, and why the faculty members teach there. They seek the nurture and fellowship of a community of the faithful, where they can develop their understanding and knowledge of their own faith, and where they can prepare to propagate it in the world at large.

The order secured by the State Board of Higher Education requires that on December 22, 1979, Shelton College, the core of this community of believers, must cease teaching. By state fiat a religious community will be destroyed.

482 F.Supp. at 974.

5. Specifically, the district court enjoined the Board from enforcing the state court order forbidding teaching and advertising, and prohibiting award of credits toward a Florida degree, but declined to enjoin the Board from enforcing the order prohibiting the grant of New Jersey degrees. Contrary to the suggestion in the concurring opinion, page 896, that the district court enjoined enforcement of the licensing scheme in other respects, in fact no more was enjoined than enforcement of an overbroad temporary injunction.

6. Centenary College for Women, L. 1867, C. 103, p. 172; Seton Hall University, L. 1861, C. 86, p. 198; St. Michael's Monastery, L. 1866, C. 319, p. 753; Drew University, L. 1868, C. 2, p. 4; Stevens Institute of Technology, L. 1870, C. 52, p. 166; St. Peter's College, L. 1872, C. 487, p. 1117. These six chartered degree-granting institutions, of which five were religiously affiliated, joined Rutgers, the State University (formerly the Queen's College) and Princeton University (formerly the College of New Jersey) both of which, also originally religiously affiliated, held Royal charters authorizing the granting of degrees.

passed authorizing any seminary or school of theology, whether founded under a general act of the legislature or by an old special charter, to confer designated degrees. P.L. 1897, C. 27, § 1, p. 42; N.J.S.A. 18A:68–2. Two years later a statute authorized any college founded under any general act of the legislature to "give diplomas and confer degrees upon those who shall successfully complete prescribed courses of study, and confer honorary degrees upon such others as shall be recommended thereafter by its board of trustees." P.L. 1889, C. 116, § 1, p. 168; N.J.S.A. 18A:68–1.[7] No license requirement or other form of state regulation accompanied these general authorizations.

In 1912, in the gubernatorial administration of Woodrow Wilson, a former president of Princeton University, New Jersey for the first time adopted legislation prescribing the terms and conditions under which degrees could be conferred, and prohibiting the conferring of a degree "until the terms and conditions of such degree . . . shall first be submitted to and approved by the State Board of Education." P.L. 1912, C. 315. This legislation exempted from the license and course approval requirements the specially chartered institutions listed in footnote 5, both religiously affiliated and secular, and New Jersey still considers them exempt. N.J.S.A. 18A:68–6; N.J.A.C. 9:1–2.15. Institutions founded under any general act, including religiously affiliated institutions such as Shelton, were covered by the 1912 law, and by a 916 statute, P.L. C. 152, § 1, p. 308, which superseded it. Section 1 of the 1916 law, found now at N.J.S.A. 18A:68–3, provides:

> No corporation shall furnish instruction or learning in the arts, sciences, or professions for the purpose of admitting any person to the grade of a degree, or shall confer or participate in conferring a degree, giving to any person a diploma of graduation or of proficiency in a course of study, in learning, or in scientific arts or methods, within this state, until it shall have filed a certified copy of its certificate of incorporation with the board of higher education and obtained for such board a license to carry on the business under such rules as the board of higher education may prescribe.

Section 2 of the same law prohibits the corporation and any of its members or officers from admitting any person to the grade of a degree "without first submitting the basis or conditions thereof to the board of higher education, and obtaining its approval thereof, and of the practice of conferring and bestowing such degrees." N.J. S.A. 18A:68–6. The 1916 law authorizes the Attorney General of New Jersey to seek from the Superior Court an order restraining any corporation from "carrying on the business of such instruction or teaching, or conferring any such degree, or giving any such diploma without such license." N.J. S.A. 18A:68–5. The same section permits the Superior Court to proceed "in a summary manner or otherwise." Monetary penalties, assessable against the corporation, its members or officials in a summary proceeding, and the nonpayment of which results in a 90 day civil commitment to a county jail, sanction the license and approval requirements. P.L. 1916, C. 152, § 4 p. 310; N.J. S.A. 18A:68–9, 10.

The 1916 law contains no exemption for Board approval of courses whose content is religious, or for diplomas or degrees in theological subjects. Nor does it contain any standards to guide the Board in approving "the basis or conditions" of a degree "in recognition of the attainment or (sic) proficiency of any person in pursuing or graduating from any course or courses of study, arts, or learning." N.J.S.A. 18A:68–6. The Board has, however, adopted extensive regulations for those New Jersey institutions subject to its licensure and approval jurisdiction. N.J.A.C. 9:1–1.1—9:1–6.4. Application for a license requires submission of a detailed questionnaire and supporting documents. The prescribed form of questionnaire, found in Appendix C to title 9 of the

---

7. The 1899 statute expressly negated authority for a college to confer degrees or diplomas authorizing the practice of medicine, dentistry, or law.

New Jersey Administrative Code, p. 36.4 et seq., is attached to this opinion as Appendix 1.

For institutions accredited by the Middle States Association, a private accrediting organization, the Board ordinarily accepts such accreditation as sufficient for licensure and approval. N.J.A.C. 9:1–2.1. For institutions not approved by the Middle States Association, the Board has established a Licensing Approval Advisory Board. N.J. A.C. 9:1–2.3–8. The Licensing Approval Advisory Board recommends policies for licensure and degree approval for institutions not regionally accredited, recommends approval or disapproval of petitions for licensure, and reviews proposed license revocations. N.J.A.C. 9:1–2.7. Presumably the Advisory Board's recommendations are made consistent with the Board's regulations. These govern an institution's statement of purpose, N.J.A.C. 9:1–1.2; organization and administration, N.J.A.C. 9:1–1.3; finances, N.J.A.C. 9:1–1.4; educational programs, N.J.A.C. 9:1–1.5; faculty, N.J.A.C. 9:1–1.7; library, N.J.A.C. 9:1–1.8; students and student services, N.J.A.C. 9:1–1.9, physical facilities, N.J.A.C. 9:1–1.10; and official publications, N.J.A.C. 9:1–1.11. The regulations are, in a word, pervasive. Of particular relevance to religiously affiliated institutions is the regulation dealing with statement of purpose:

(a) Regulations concerning statement of purpose are:

1. Each institution shall maintain appropriate and operationally effective statements of purpose (such as those found in the college catalog and other official documents) and shall review these statements for possible revision and improvement at periodic intervals not to exceed five years;

2. Copies of statements of purpose shall be promptly filed with the chancellor and, when required by the Department of Higher Education, implementation schedules shall be similarly filed.

(b) Standards concerning statement of purposes are:

1. Statements of institutional purpose should define the educational climate to be established, the nature of the education students are expected to have upon graduation, the occupational and other outcome expected from the programs, and the aspects of individual growth to be enriched or developed;

2. Each institution should be prepared to present evidence that the various elements of institutional life (faculty work, educational program, student life, finances, physical plant, organization and administration) are structured to support the purposes stated;

3. Each institution should develop a long-range plan to implement its goals, including a written schedule of priorities, resource allocations and responsibility assignments, with target dates for the realization of specific objectives;

4. Purposes and plans should be developed and periodically reviewed by a committee drawn from appropriately concerned institutional constituencies, and should be available for distribution to all constituent groups.

N.J.A.C. 9:1–1.2.

The requirement of a statement of purpose is not merely informational, for the regulation dealing with educational programs provides that "[t]he educational program shall reflect and support the purposes of the institution" and "shall include course work and other activities extending over a sufficient period of time and in sufficient intensity to fulfill the purposes of the institution." N.J.A.C. 9:1–1.5(a)1, 2. Thus on the face of the regulations it would appear that in order to obtain a license, an institution with a religious commitment such as Shelton's must submit to the Board a statement of its religious purpose, as well as evidence that the various elements of its institutional life are structured to support that purpose, and must submit to the Board's judgment the question whether its educational program reflects and supports that purpose. Facially, therefore, the Board's licensing regulations suggest a very

high degree of state entanglement in Shelton's religious affairs. And the 1916 law unambiguously prohibits instruction leading to a diploma or degree, even in theology, absent a license.[8]

## III.

### Prior Litigation

At one time Shelton had a New Jersey license. Under the 1916 Act the Board may revoke a license, N.J.S.A. 18A:68–4, and in 1966 it instituted a revocation proceeding.[9] When the Board entered an order limiting Shelton's authority to grant a bachelor of arts degree to June 30, 1967, the college sought review of the agency's decision in the Superior Court, Appellate Division. *See* N.J.R. 2:2–3(a)(2). The Supreme Court of New Jersey certified the case before argument in the Appellate Division, reviewed the abbreviated record made before the agency,[10] and considered Shelton's legal challenges to the 1916 law. In this agency review proceeding Shelton adduced no proof, but contended that the 1916 law was unconstitutional:

1. because any effort by the state to regulate in any way the award of a bachelor's degree violated the free speech guaranty of the first amendment;

2. because the statute sets forth no standard for the exercise of delegated legislative power, and thus violates Art. IV § 1 ¶ 1 of the New Jersey Constitution;

3. because the grandfather clause exempting the chartered institutions listed in footnote 5 creates an unconstitutional classification; and

4. because the Board lacked statutory power to grant conditional approvals.

No free exercise clause or entanglement claims were made or considered. The Supreme Court rejected the four claims Shelton did present. Following that court's decision, further revocation proceedings took place before the Board, and ultimately Shelton lost its license.[11] So far as this record discloses, no free exercise clause or entanglement claims were made or considered at

8. Cf. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502–03, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533 (1979) (NLRB jurisdiction over alleged unfair labor practices in Catholic religious schools would result in impermissible entanglement, for the Board's resolution of unfair labor practices charges "will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." Moreover, NLRB determination of the "terms and conditions of employment" would enmesh the Board in "nearly everything that goes on in the schools.").

9. The reasons for the proposed revocation do not appear in this record or in any reported New Jersey opinion.

10. Chief Justice Weintraub described that record as follows:

The record consists only of the notice of appeal and the resolutions already mentioned. The first resolution, dated December 13, 1965, recites the following: that on June 2, 1965 the State Board of Education resolved not to grant approval to Shelton of its practice of conferring degrees; that a hearing begun on July 21, 1965 was interrupted by legal action initiated by Shelton with the result that the school year 1965–66 got under way; that upon request Shelton submitted a statement of its current condition; that a further investigation revealed compliance with some of the standards which theretofore had not been met; that a question continues as to compliance with other standards described in the resolution; but nonetheless in the interest of the students then enrolled and in the light of the problems attendant upon a disruption of the college in midyear, approval was given of the practice of conferring the degree of bachelor of arts, such approval to continue to September 15, 1966. As we have already noted, the State Board of Education adopted a further resolution (dated June 27, 1966) which, after reciting a later annual evaluation of the college and the Board's finding that certain specified standards had not yet been met, nonetheless concludes the authority to bestow the degree of bachelor of arts should be extended until June 30, 1967 upon, however, 12 stated conditions to be met by Shelton not later than May 1, 1967.

48 N.J. at 505–06, 226 A.2d at 614–15. The record in this case does not disclose what were the 12 stated conditions for licensure.

11. Only a procedural aspect of the revocation proceedings was reviewed by the New Jersey Courts. *In re Shelton College*, 109 N.J.Super. 488, 263 A.2d 810 (App.Div.1970).

any time in the Board's revocation proceedings. Nor is there any indication that any of the previous New Jersey agency or court litigation dealt with teaching rather than degree granting.

 The Board contends that the doctrines of res judicata or collateral estoppel preclude preliminary injunctive relief, and require dismissal of the complaint. The district court rejected this contention. 482 F.Supp. at 975–76. We agree. The federal courts are referred, for the claim and issue preclusion effect of a state court judgment, at least initially, to the law of the rendering state. 28 U.S.C. § 1738. New Jersey requires, for the application of res judicata, identity of causes of action, of parties or their privies, and of issues. *E. g., Brick Tp. Ocean County v. Vannell*, 55 N.J.Super. 583, 590, 151 A.2d 404, 408 (App.Div.1959) (Haneman, J.). In the license revocation proceedings only Shelton was a party. There has been no showing that for purposes of the free exercise and establishment claims Shelton was a privy for the Churches, parents, students, and faculty member presently before us. Moreover, even as to Shelton there has been no showing that the license revocation proceeding involved in any way the religion clause issues urged in this Section 1983 action. Clearly a New Jersey court would not hold that the complaint before us is barred by res judicata. Indeed if it were to do so with respect to the claims of the Churches, parents, students and faculty member, such a holding would violate the due process clause of the fourteenth amendment. *Parklane Hoisery Co. v. Shore*, 439 U.S. 322, 327 n.7, 99 S.Ct. 645, 649, n.7, 58 L.Ed.2d 552 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard"); *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940).

 As to collateral estoppel, that doctrine in New Jersey precludes relitigation only of questions "distinctly put in issue" and "directly determined" adversely to the party against which the estoppel is asserted. *City of Plainfield v. Public Service Gas and Electric*, 82 N.J. 245, 257–58, 412 A.2d 759, 765–66 (1980). Moreover, under the New Jersey rule, if the judgment is based on one or more of several grounds, but does not expressly rely on any of them, none is conclusively established, since a subsequent court cannot tell what issue or issues were in fact fully adjudicated. *Ettin v. Ava Truck Leasing, Inc.*, 53 N.J. 463, 480–81, 251 A.2d 278, 287 (1969) (Jacobs, J.), overruling *Kelley v. Curtiss*, 16 N.J. 265, 108 A.2d 431 (1954) (Brennan, J.). *Cf. Boykins v. Ambridge Area School Dist.*, 621 F.2d 75 (3d Cir. 1980) (no preclusive effect accorded decision of state agency when impossible to tell what it decided). Here it is clear from the two judicial opinions in Shelton's prior litigation with the Board that no religion clause claims were considered or determined.

The Board has not made any showing as to what, finally, was litigated at the agency revocation proceedings which were not judicially reviewed. Whether New Jersey would apply principles of judgment preclusion—either res judicata or collateral estoppel—to those proceedings is a decidedly open question, depending on an analysis of the Board's statutory authority to perform an adjudicative as distinguished from a policy making function. *See Lubliner v. Bd. of Alcoholic Bev. Co., Paterson*, 33 N.J. 428, 165 A.2d 163 (1960).[12] For two reasons, however, we need not speculate whether New Jersey would treat the Board's license revocation proceeding as adjudicative or policy making. First, "[r]es judicata and collateral estoppel are affirmative defenses that must be pleaded." *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971); Fed.R.Civ.P. 8(c). The Board did not, in opposing the grant of a preliminary injunc-

---

12. New Jersey does accord res judicata and collateral estoppel effect to decisions of admin-istrative *tribunals, City of Hackensack v. Winner*, 82 N.J. 1, 410 A.2d 1146 (1980).

tion, establish that it adjudicated the religion clause claims presented in this case, or even that it had statutory jurisdiction to consider them. It simply failed to meet the burden Rule 8(c) imposes.[13] Second, the Supreme Court has held that neither 28 U.S.C. § 1738 nor federal common law principles of res judicata require deference to administrative as distinct from judicial proceedings, *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226–28, 29 S.Ct. 67, 69–70, 53 L.Ed. 150 (1908); *FTC v. Texaco, Inc.*, 555 F.2d 862, 894 (D.C.Cir.) (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977).[14]

We conclude, therefore, that the district court did not err in rejecting the Board's contention that the prior litigation referred to precluded the grant of a preliminary injunction protecting the plaintiffs from violations of the religion clauses of the first amendment. See *New Jersey Education Ass'n v. Burke*, 579 F.2d 764 (3d Cir. 1978); *cf. Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).[15]

### IV.

#### Younger Dismissal

Although it has not abandoned its judgment preclusion argument, the Board on appeal relies chiefly on the contention that principles of equity, comity and federalism required that the federal court stay its hand so that the religion clause contentions be litigated first in the Superior Court of New Jersey. It relies on the spawn of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), to assert that because

the Board filed its Superior Court action against Shelton's directors and two of its officers first, the federal complaint of all the plaintiffs, whether or not they were defendants in the state court action, must be dismissed. The district court rejected that broad proposition; rightly so, we hold.

■ We note at the outset that for the Churches, parents, students and teacher, the governing precedents are *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaratory relief) and *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (preliminary injunctive relief). These plaintiffs are not parties to any state court proceeding. Like the plaintiff in *Steffel*, they were confronted, from the commencement of the state's lawsuit against someone else, with a real threat of harm to them. Each of these plaintiffs has asserted individual first and fourteenth amendment rights distinct from those Shelton, its directors and its officers assert. See Verified Complaint, pp. 3–4; 7–9; 13–15. Specifically, the Churches maintain that the Board's enforcement of the regulations deprives them of their first and fourteenth amendment rights to minister to young adults through Shelton College; the students argue that enforcement deprives them of their first and fourteenth amendment rights to receive a Christian education; the parents assert enforcement deprives them of their first and fourteenth amendment rights to guide their children's choice of post-secondary education; the teacher claims enforcement deprives him of his first and fourteenth amendment rights to "pursue his religious ministry and Chris-

**13.** *See New Jersey Education Ass'n v. Burke*, 579 F.2d 764, 775–76 (3d Cir. 1978) ("res judicata is an affirmative defense, dependent on the factual issue of what submissions were actually made to the state court")

**14.** Moreover, litigants need not exhaust those remedies before seeking relief under Section 1983. *Moore v. City of East Cleveland*, 431 U.S. 494, 497 n.5, 97 S.Ct. 1932, 1934, n.5, 52 L.Ed.2d 531 (1977); *Ellis v. Dyson*, 421 U.S. 426, 432, 95 S.Ct. 1691, 1695, 44 L.Ed.2d 274 (1975); *McNeese v. Board of Educ.*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

**15.** The Supreme Court's recent decision in *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), does not warrant a different conclusion here. That decision affirmed the application of 28 U.S.C. § 1738 to litigation under 42 U.S.C. § 1983, but also stressed that the full faith and credit statute required that the federal plaintiff have fully and fairly litigated the same issues in state court. Because the prior New Jersey proceedings did not address Shelton's religion clause contentions, neither § 1738, nor the Supreme Court's *McCurry* discussion would attribute preclusive effect to the earlier New Jersey proceedings.

tian apostolate." These rights, with the possible exception of the Churches' rights (the Churches characterize Shelton as an "agency" of the Bible Presbyterian Church), are all distinct from the college's right to exist as a religious-educational institution.[16]

The Supreme Court has held that the "opportunities of pupils to acquire knowledge," is a first amendment right distinct from the right to impart knowledge. *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923). Moreover, the Court has recently emphasized that the distinct "first amendment right 'to receive information and ideas' . . . is nowhere more vital than in our schools and universities." *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972). Even if one concludes that the Churches, teacher, and parents have no independently assertable rights, Supreme Court precedent clearly indicates that the students have distinct rights which may be enforced in a separate federal action.

An objection might be made that despite their assertion of independent rights, all of these plaintiffs are too interrelated with Shelton College to permit a separate federal court action. The Supreme Court's articulation of the contours of derivative preclusion in *Younger* cases, however, has been limited to preclusion of an employer's federal suit when its employees assert identical interests in state court, *Hicks v. Miranda*, 422 U.S. 332, 348–49, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975), and to preclusion of federal plaintiffs too intertwined with the state defendants "in terms of ownership, control and management," *Doran v. Salem Inn*, 422 U.S. at 929, 95 S.Ct. at 2566. Clearly, a majority of the Court has formulated derivative preclusion only in terms of an identity of economic activities and interests. Certainly, the parents and students in this action neither own, nor control, nor manage Shelton College. Arguably, the teacher, as a Shelton College employee, might be barred under *Hicks*. The relevance of *Hicks*, however, is merely superficial. The employer in *Hicks* was derivatively precluded because any claim his employees could make in state court regarding their first amendment right to participate in the screening of *Deep Throat* derived from their status as agents asserting the employer's right to show the film. Here, the teacher asserts an individual first amendment right to teach a particular theology. That right is distinct from Shelton's right, as a school, to propagate its doctrine. Arguably, the Churches might be precluded under an ownership, management and control theory. But while Shelton College is the teaching arm of the Bible Presbyterian Church, the Board has not shown to what extent the two Churches in this suit in fact manage and control the college, and the state court action is against the separate directors and officers of the college.[17]

The concurrence purports to rely not on an interrelationship analysis to preclude the

---

**16.** Hence, it is clear that the suggestion in the concurring opinion that the nonparties are in effect suing only on behalf of Shelton College, *see* concurring op. at 903 n.13, finds no foundation in the record.

**17.** Chief Justice Burger's concurrence in *Allee v. Medrano*, 416 U.S. 802, 830–31, 94 S.Ct. 2191, 2208, 40 L.Ed.2d 566 (1974), would also extend the derivative preclusion principle to an *organization seeking to assert in federal court* the interests of members prosecuted in state court. A majority of the Court has yet to adopt an organizational preclusion theory. Even if that theory represents the direction toward which the Court is inclined, it is of no relevance to the students, teacher, and parents here, for the Chief Justice did not contend that individual members of an organization could not assert their own interests in federal court when the organization was the subject of a pending state enforcement proceeding. Such an assertion would in this case reduce to an untenable proposition that if a church might assert its congregation's interests in state court, no individual member of the flock may be heard in federal court to press the tenets of his or her own faith.

Nor does the Chief Justice's concurrence stand for the proposition that an individual federal plaintiff who is a member of an organization to which the individual state defendant also belongs may not sue in federal court. In *Steffel*, both the state defendant and the federal plaintiff were leafletting for the Atlanta Mobilization Committee [Against the War in Vietnam]. The Court never suggested that affiliation with that organization would preclude the federal plaintiff's suit.

nonparties' action, but on a theory that derivative preclusion is warranted here because the nature of the relief the district court awarded in this case differs markedly from the relief in *Steffel* and *Doran*. Although those cases arose out of nearly identical fact situations and presented identical legal issues to the state and federal tribunals, the concurrence notes that the federal courts were not asked to interfere in the pending state proceedings. It urges that in this case, however, the federal court is requested to enjoin the enforcement of the state court's preliminary injunction. Unlike *Steffel* and *Doran*, therefore, this case involves *direct* federal interference in an ongoing state enforcement proceeding. If the *Younger* doctrine forbids anything, the concurrence contends, it prohibits any direct federal court interference with any state enforcement proceeding.[18] This "direct interference" theory, while initially appealing, does not withstand analysis. First, the district court did not directly—or indirectly—interfere in the state court *proceedings*. The district court restrained the *Board*

from availing itself of a portion of the preliminary relief the state court granted. The district court's ruling in no way hindered the state court from ruling on the merits of the Board's claims or of Shelton's constitutional challenges. *Cf.* discussion *infra* Part V. p. 885. Even assuming, arguendo, the district court's limited ruling had been a "direct interference", a theory proposing that any direct interference violates *Younger* still proves inadequate. Had the nonparty plaintiffs in this action sought merely a declaratory judgment invalidating the Board's regulations, rather than an injunction limiting the scope of the state court injunction, there would be no *direct* interference in the state court proceeding, and this case would look very much like *Steffel v. Thompson*. These plaintiffs did in fact seek such a declaratory judgment (in addition to injunctive relief), but the federal district court, in deference to state court adjudication of the merits of the regulations, declined to intrude so far into the substance of the state court controversy.

18. The cases which the concurring opinion cites, however, are all interrelationship decisions. In addition to *Hicks* and *Allee*, the lower court decisions on which the concurrence relies, none of them from this circuit, also make a "nexus" analysis. In *ACLU v. Bozardt*, 539 F.2d 340 (4th Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976), an ACLU member attorney faced state disciplinary proceedings. The Fourth Circuit observed the ACLU might have standing to assert the separate associational interests of its other member attorneys, but held the ACLU's action barred under *Younger* on some rather unarticulated ground that allowing an organization to attack the same state law at issue in the state proceeding, with the possible result that the state defendant ACLU member might benefit by the federal court's action, would be an impermissible end-run around *Younger*. This discussion is confined to one rather conclusory paragraph.

In *Doe v. Maher*, 414 F.Supp. 1368 (D.Conn. 1976) (3-judge court), *vacated on other grounds*, 432 U.S. 526, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977), the District of Connecticut explicitly allowed the federal plaintiff to assert her *individual* interests, but forbade her to represent a *class* that included the state defendants.

In *Corpus Christi People's Baptist Church v. Texas Dep't of Human Resources*, 481 F.Supp.

1101 (S.D.Tex.1979), *aff'd mem.* 621 F.2d 438 (5th Cir. 1980), the Southern District of Texas deemed the federal-only plaintiffs "mere appendages" of the state defendants. The court held they asserted no interests distinct from the state defendant's claims. A clearer "nexus" holding cannot be found.

Thus, the concurring opinion's cases have nothing to do with the direct interference theory it advances, although they do support the "nexus" ground on which it declines to rely as the primary ground of preclusion. Moreover, the concurrence reveals a further inconsistency. In Footnote 13, it asserts that had the federal-only plaintiffs in this case advanced an interest distinct from the state defendants', this case would be consistent with *Steffel* and *Doran*. This proposition contradicts the prior discussion in two ways. First, the concurrence's assumption that the nonparty federal plaintiffs have no distinct interests is in fact a conclusion that the plaintiffs and the state defendants are too interrelated. Second, the conclusion that a separate interest would make this case analogous to *Steffel* and *Doran* contradicts the initial premise that these cases bar *direct* interference with state enforcement proceedings. The assertion of a separate interest does not alter the requested relief of an injunction against enforcement of the state preliminary injunction.

Rather, it awarded the more limited relief of an injunction restraining enforcement of part of the state court preliminary injunction. The course which the district court declined to take, and of which the concurrence would apparently approve—invalidating the regulations—would have been far more intrusive to the state enforcement scheme, although it would not have impinged *directly* on the state court's adjudication. As the Supreme Court has recognized, the collateral intrusion of a declaratory judgment invalidating the contested state law is just as disruptive to state enforcement as direct interference in the state proceeding in the form of an injunction. *See Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

Moreover, the Supreme Court has declined to draw a direct interference/collateral intrusion line in *Younger* cases. In *Doran v. Salem Inn*, the nonparty plaintiffs did not seek directly to intrude on the state prosecution of M & L Bar. They sought an injunction against enforcement of the topless bar ordinance. The Supreme Court held there might be cases in which nonparty plaintiffs might be precluded from bringing a federal action, not because those plaintiffs were seeking directly to intrude in the pending state action, but because they might be so interrelated "in terms of ownership, control, and management," that pursuit of a separate federal action would undermine *Younger*. As *Doran* makes clear, the real problem is not the relief sought in federal court, but the relationship of the

nonparty federal plaintiffs to the state defendants.[19] As has been shown, the nonparties here do not fall within the *Hicks-Doran* "nexus" with the state defendants.

A final derivative preclusion theory, implicit in the concurring opinion, is that the nonparties' distinct federal claims should be barred if the outcome of the state enforcement proceeding would in a practical sense be dispositive of their interests. This argument is, in effect, a variant of the interrelationship theory. The decision advancing it on which the concurrence relies is *Corpus Christi People's Baptist Church v. Texas Dep't of Human Resources*, 481 F.Supp. 1101 (S.D.Tex.1977), *aff'd mem.* 621 F.2d 438 (5th Cir. 1980). That case involved a state enforcement proceeding against an unlicensed church-operated child care home. The court held the nonparty parents and children barred from asserting a federal claim in federal court. Holding the rights of the nonparties "merely appendages" to the church's rights, the court assumed that the parents and children who made use of the church-operated child-care home had no interests distinct from the state-defendant church's. Rather than considering whether those federal plaintiffs might not have a separate interest in religiously-oriented child care, the court concluded there could be no such interest because if the church won in state court, the federal plaintiffs' rights would be vindicated, and if the church lost, the federal plaintiffs would have no interest left because the home would have gone out of business.[20] A nexus

**19.** There is a further difficulty with the concurrence's direct interference argument. A federal *plaintiff not the subject of a pending state* enforcement proceeding cannot avoid interfering in some way with some pending state proceeding if he seeks to declare the underlying statute invalid, or to enjoin the state official from enforcing that statute. Unless there is some pending enforcement proceeding against someone, the unrelated federal plaintiff may be dismissed on the ground that his suit is not ripe, or that he lacks standing. See Chief Justice Burger's concurrence in *Allee v. Medrano, supra.* Because it is clear that "collateral" federal interference is no less intrusive than direct interference in the workings of the state court, the concurrence must be read to preclude nonparty federal plaintiffs from initiating any fed-

eral declaratory or injunctive action. This proposition, however, has been squarely rejected by this Circuit in *New Jersey Education Ass'n v. Burke*, 579 F.2d 764, 770 (3d Cir. 1978). There, Judge Adams, writing for a unanimous panel, stated "the extreme of the extension [of the *Younger* doctrine] would be an assertion that *Younger* precludes jurisdiction whenever any state proceeding is pending." The court declined to make such an extension. The concurrence, apparently, if inadvertently, would have the panel make that extension now.

**20.** The district court cited two district court decisions, *Marsico v. Elrod*, 469 F.Supp. 825 (N.D.Ill.1979), and *Hjelle v. Brooks*, 424 F.Supp. 595 (D.Alaska 1976). Those cases,

finding on the ground that if the state defendant prevails, the federal plaintiff's interests would be vindicated proves too . much. In *Steffel* and *Doran*, had the state defendants obtained rulings invalidating the local laws, the federal plaintiffs would have been vindicated. Indeed, no matter how unrelated the federal plaintiff, so long as some state defendant might successfully challenge the same state law, the federal plaintiff's rights would be vindicated. That does not mean that a federal plaintiff may not bring an action so long as some state proceeding addressing the same constitutional issue is pending. This circuit in *New Jersey Education Ass'n v. Burke*, 579 F.2d 764, 770 (3d Cir. 1978), has squarely rejected that proposition. Similarly, a state defendant's failure in state court may often defeat an unrelated federal plaintiff's interests. If, for example, a state court is requested to enforce a local criminal obscenity law against a pornographic publication, and grant of that relief would mean the publica-

tion would cease distribution in that area, it is inconceivable that a federal court would hold a reader barred from asserting his first amendment interest in reading the magazine on the ground that should the magazine lose in state court, his interests would be resolved because there would be nothing left to read.[21] Absurd as such a holding sounds, it is in essence the conclusion of the *Corpus Christi* court. We decline to rely on such a precedent.

■ It is clear, then, under *Steffel* and *Doran*, that nonparties to the state enforcement proceedings who assert independent constitutional interests may advance those interests in a separate federal action. Since the interests of any of these plaintiffs alone are sufficient to justify the court's consideration of the application for a preliminary injunction, that order cannot be reversed on the chief ground the Board advances, absent a very great extension of the *Younger* rule, which would, in effect, ignore the teachings of *Steffel* and *Doran*.[22]

however, involved paradigm *Hicks-Doran* preclusion situations. In *Marsico*, an adult theater projectionist was barred from federal court when his employer was a state court defendant. In *Hjelle*, the court applied *Doran's* management and control formula to bar the federal suit of a group of fishermen operating under the same management and control as a group of fishermen subject to a pending state proceeding. Neither decision offers an analysis upholding preclusion on the theory that the outcome of the state proceeding would affect the rights of the federal plaintiffs.

21. It should be noted that this hypothetical plaintiff would not be suing on the publication's behalf, nor would he be asserting a broad scale injury to an undifferentiated public inter-est. Rather, as a plaintiff maintaining a specific relationship of readership with the publication, this plaintiff would have standing to challenge the infringement of his individual first amendment rights to read and to receive information under *Virginia State Bd. of Pharmacy v. Virginia Consumer Council, Inc.*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–1823, 48 L.Ed.2d 346 (1976) (ban on drug price information held to violate first amendment rights of consumers to receive information), and *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (recipient of communist literature mailed from overseas challenged statute requiring the post office to detain "communist propaganda"). Indeed, although the majority opinion assumed there was standing,

Judge Brennan's *Lamont* concurrence drew a careful distinction between a reader's standing to assert a publication's interests, and a reader's standing to assert his individual interest. In the latter case, there clearly was standing, for

the First Amendment 'necessarily protects the right to receive [the material].' ... [T]he right to receive publications is ... a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers. 381 U.S. at 308, 85 S.Ct. at 1497 (Brennan, J., concurring) (citations omitted). *See also Kleindienst v. Mandel*, 408 U.S. 753, 762–65, 92 S.Ct. 2576, 2581–83, 33 L.Ed.2d 683, discussed *supra* at p. 878.

22. Shelton contends that it, too, is an appropriate federal plaintiff. The Board urges that although the defendants in the section 18A:68–5 proceeding are Shelton's Board of Directors and two of its officers, Shelton is for all practical purposes a party to that state court suit. Shelton does not dispute its party status, but urges that a *Younger* dismissal would be improper in the circumstances of this case. *See Younger v. Harris*, 401 U.S. at 46, 54, 91 S.Ct. at 751, 755 (irreparable harm exception). The possibility that a section 18A:68–5 case will be handled summarily, and the absence of any but discretionary appellate review of pendente lite

■ The Board urges we disregard the impeding Supreme Court precedent, and make the requested extension by requiring that the Churches, parents, students and teacher intervene in any pending state proceeding in order to litigate their own separate rights. There are several serious obstacles to the adoption of such a rule. First and most obviously, as recently as *Wooley v. Maynard*, 430 U.S. 705, 710, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977), Chief Justice Burger, writing for the Court, reaffirmed the holdings of *Steffel* and *Doran* : that a federal forum is available to litigants threatened with violations of federally protected rights and not presently parties to a state court proceeding.

Second, the Board's brief refers us to no New Jersey law, and our own research has disclosed none, suggesting that non-parties could intervene of right in the New Jersey action. The Supreme Court has repeatedly asserted that a primary motivation in its adoption of the *Younger* doctrine was the insulation of state enforcement of its criminal law from litigious interruptions. *See, e. g., Kugler v. Helfant*, 421 U.S. 117, 129–31, 95 S.Ct. 1524, 1533, 44 L.Ed.2d 15 (1975); *Younger v. Harris*, 401 U.S. at 43–44, 91 S.Ct. at 750. Even when the doctrine was extended to certain civil cases, that step was justified because of the close relationship of those cases to state penal policies. *See, e. g., Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979);

*Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). Certainly neither New Jersey nor any other state would permit third parties to intervene and participate in criminal prosecutions. One obvious reason for the *Steffel-Doran* qualifications of the *Younger* doctrine is the recognition that a pending prosecution against someone else affords no opportunity for non-parties to assert their own first amendment rights, because the state will not permit them to participate in the defense of penal charges against others. The licensing scheme of the 1916 Act does not provide for enforcement by indictment, but it does embody a strong state penal policy; so strong, indeed, that the normal due process protections of indictment and trial by jury have been eliminated in favor of civil penalties enforceable in a summary proceeding and by civil incarceration, N.J. S.A. 18A:68–9, 10, and by a summary proceeding restraining violations. N.J.S.A. 18A:68–5. When the district court acted on the application for a preliminary injunction, the Board tendered to it no authority suggesting that intervention by the parents, the students and the faculty member would be any more welcome in the pending proceeding under Section 18A:68–5 than in a criminal prosecution. Nor has any such authority been suggested to us.[23]

orders cast some doubt on the adequacy of the opportunity to litigate Shelton's federal claims in the State Court. *See Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973) (*Younger* dismissal improper if federal plaintiffs would have no "opportunity to raise and have timely litigated by a competent state tribunal the federal issues involved"). These issues need not be addressed in disposing of the Board's appeal from the order granting a preliminary injunction. That order did not dismiss Shelton as a plaintiff. But its plaintiff status neither adds to nor subtracts from the standing of the remaining plaintiffs to seek pendente lite relief. If they were proper plaintiffs, and they were, it was proper to proceed with the federal court hearing. Contrary to the suggestion of the concurring opinion, at 900, we do not hold that Shelton can come under any nonparty/nonpreclusion exception to the *Younger* doctrine.

23. With the benefit of hindsight, we know that although a broad temporary restraining order was issued at the outset of the state court Section 18A:68–5 proceeding, that proceeding was thereafter anything but summary, at least in the temporal sense. The opinion of the Superior Court, Chancery Division was filed on November 7, 1980. In a section of the opinion bemoaning the action of the district court, its author refers to the possibility of "remitting the federal plaintiffs to their remedies in the pending state suit," but nowhere identifies what those remedies would be for non-parties. *The New Jersey State Board of Education et al. v. The Board of Directors of Shelton College et al.*, Slip op. at 9 (N.J.Superior Ct.Ch.Div.C. 1088–79E). When the district court acted there was no way of telling that the Section 18A:68–5 proceeding would be conducted other than summarily.

The reality confronting the district court, when it acted on the application for a preliminary injunction, was that the Churches, parents, students, and faculty member could protect their first amendment rights only by a separate action somewhere; either in the district court or in a separate action in a New Jersey court. Had they resorted to a separate action in a New Jersey court, that court would have been required to enforce the same Section 1983 cause of action which they have pleaded in the federal court. *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). That cause of action includes the right to be protected, pendente lite, from unlawful restraints upon and unlawful state entanglements in their free exercise of religion. Assuming that their claims for such pendente lite relief were meritorious, a state court, applying federal law, would be obliged to grant them the same relief against the pending Section 18A:68–5 action as would a federal district court. If it did, the interference with the penal policy

of New Jersey embodied in the 1916 law would differ from the same relief granted by a federal tribunal only in some Pickwickian sense. It is the federal law which binds both tribunals, not the address of the court house, that interferes with the state's penal policy. Assuming that both tribunals would be receptive to claims of pendente lite protection of first amendment rights (and on this score the Attorney General's brief reassures us) then the defendant Board, charged with enforcement of the state's penal policy would appear to have no substantive interest adversely affected by the parents', students' and teacher's choice of a forum.[24]

From the viewpoint of these plaintiffs, who are not parties to the Section 18A:68–5 proceeding, however, the choice of a forum is significant. Congress has in 28 U.S.C. § 1343(3) given them that choice, for "*Younger* principles aside, a litigant is entitled to resort to a federal forum in seeking redress under 42 U.S.C. § 1983 for an al-

Although the defendants in the state proceeding could, under *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), assert as a defense the constitutional interests of the nonparty parents and students, the Supreme Court has never suggested those nonparties would therefore be precluded from instituting their own action, and would be obliged to rely for their sole remedy on the disposition of the action against the school. *Cf.* note 17 *supra.*

We further note that no decision in the Supreme Court's *Younger* line has concerned interposition of additional *parties* to a pending state enforcement action. The Court has instead focused on whether state procedural law impeded the state defendant's ability to raise additional, federal, *claims* in the state proceeding. *See, e. g., Moore v. Sims*, 442 U.S. at 425–26 & n. 9, 99 S.Ct. at 2378 n. 9; *Quern v. Hernandez*, 405 F.Supp. 757 (N.D.Ill.1978), *summarily aff'd,* 440 U.S. 951, 99 S.Ct. 1488, 59 L.Ed.2d 765 (1979).

The concurring opinion argues that the nonparties could have intervened under N.J.R. 4:33–1 (intervention of right) or N.J.R. 4:33–2 (permissive intervention). These rules and the cases which the concurrence cites, however, concern ordinary civil actions, not quasi-criminal enforcement proceedings. As the rationale for the extension of *Younger* to civil enforcement proceedings establishes, these actions are inherently different from ordinary civil cases;

hence the need to insulate them from interference.

24. Moreover, because a court, state or federal, engaged in pendente lite review of a grant of a preliminary injunction would be addressing the scope of relief afforded, and at most the likelihood of success on the merits, rather than the actual constitutionality of the law underlying the grant of relief, the pendente lite § 1983 proceeding would not be the forum in which a state court would be likely to devise a limiting construction of local law, *see* discussion *infra*, Part V.

The concurrence argues that New Jersey would not permit such a separate injunctive action, but under N.J.R. 4:52–6, would require intervention in the pending enforcement proceeding. The concurrence misconstrues the nature of that rule. It concerns *claims*, not *parties*. It was enacted, following the merger of law and equity in New Jersey trial courts, in order to require litigants advancing an equitable claim in an action at law to remain in the law tribunal rather than to press separately the equitable portion of the action in chancery. *See Tumarkin v. Friedman*, 17 N.J.Super. 20, 85 A.2d 304 (App.Div.1951); *Government & Employees Ins. Co. v. Butler*, 128 N.J.Super. 492, 320 A.2d 515 (Ch.1974) (liability insurer in obvious privity with insured, and cannot bring identical claim in chancery when subject to action at law).

leged deprivation of federal rights." *Wooley v. Maynard*, 430 U.S. at 710, 97 S.Ct. at 1433. One important practical reason for the exercise of that choice in favor of a federal forum is the additional safeguard from possible errors of federal law 28 U.S.C. § 1292(a)(1) affords. That significant provision, which brings the case before us, provides for appeals of right from the grant or denial of pendente lite injunctive relief. In first amendment contexts, where state actions imposing prior restraints on the exercise of protected rights can cause devastating and irreparable harm, the availability of that remedy often will be vital. This is particularly the case where third parties may be potentially affected by a state court decree binding someone else. A state court decree preventing a source from communicating with a reporter, or a state court decree preventing a church from admitting worshipers, are examples which come to mind. A state court decree closing a religious school—this case—is another. By contrast, appeals from grants or denials of preliminary injunctive relief are, under New Jersey law, entirely discretionary. N.J.R. 2:2–4 (1981); *Delaware River and Bay Authority v. International Organization of Masters, Mates and Pilots*, 45 N.J. 138, 142, 211 A.2d 789, 791 (1965); *Frantzen v. Howard*, 132 N.J.Super. 226, 227, 333 A.2d 289, 289 (App.Div.1975). Moreover, if a preliminary injunction is granted, such an injunction, whether or not reviewed in a discretionary N.J.R. 2:2–4 appeal, is insulated from review in the Supreme Court of the United States by the "final judgment" limitation on Supreme Court appellate jurisdiction in 28 U.S.C. § 1257. By contrast, if

this court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) the Supreme Court may also review. 28 U.S.C. § 1254.[25]

We do not stress access to federal court pendente lite appellate review of grants or denials of preliminary injunctions in cases seeking protection against prior restraints on first amendment rights as a forum selection factor for plaintiffs because state trial judges will in our view (or even in plaintiffs' view) be any more or less likely to commit error than their federal district court counterparts. Nor is it our point that this court will necessarily produce a better first amendment result than that produced by a state court which decides to grant leave for a discretionary interlocutory appeal. Rather, our point is that the legislative preclusion of Supreme Court review of any but final judgments of state courts has created the anomaly that a prior restraint in a state court preliminary injunction can be in force over a long period of time, entirely insulated from any review by that tribunal which has the ultimate responsibility for giving content to the first amendment. The possibility of access to that tribunal pendente lite by virtue of sections 1292(a)(1) and 1254 is a significant, legitimate, even compelling factor in the Churches', parents', students' and faculty member's choice of a federal rather than a state forum. What countervailing considerations can the Board offer in opposition to the recognition of that choice? Certainly the Board has not suggested that insulation from the possibility of pendente lite federal appellate review in first amendment cases is a state interest worthy of consideration.

**25.** The concurrence argues that the state court preliminary injunction would be reviewable in the U.S. Supreme Court under the collateral finality rule of *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). This contention is incorrect. *Cox Broadcasting* allows collateral appeal when there has been a final resolution of the merits of the first amendment claim, but when waiting until disposition of the entire case would irrevocably compromise the asserted first amendment right. The collateral first amendment issue, however, must be *finally* adjudicated in state court. The state court, at the preliminary injunction stage in this case has rendered no resolution, final or otherwise, of Shelton's first amendment contentions. The concurrence's attempt to find in *Cox Broadcasting* a theory that the Court has the power to read 28 U.S.C. § 1292(a)(1) into § 1257 misstates the holding and attributes to the Court the power to amend a federal jurisdictional statute.

The Supreme Court has recently restressed the strictness of the § 1257 final judgment requirement. *See San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981).

We conclude that the trial court did not err in rejecting the Board's *Younger* ground for the denial of preliminary injunctive relief.

## V.

### *Pullman Abstention*

The Board also contends that *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) required that the district court refrain from granting pendente lite injunctive relief against enforcement of the 1916 law and the regulations issued under it. It urges that had the Superior Court been afforded the opportunity to do so it might have devised a limiting construction of both the law and the regulations which obviated all first amendment concerns.

To put that contention in context, our starting point is the Board's own construction, set out in the pleading it filed in the Superior Court. Its complaint demanded judgment:

> Enjoining and restraining all defendants and their employees, servants and agents from engaging in, assisting in or causing the *offering of any courses or classes of instruction, or engaging in any form of educational instruction,* or offering or providing any credits, awards, certificates or degrees for any such instruction or educational experience which has been given to any enrolled student since September 1, 1979 in or about the property of Shelton College in Cape May, New Jersey, until a license for same is issued by the New Jersey Department of Higher Education.

Exhibit P. 17 (emphasis supplied). Acting on that complaint the Superior Court issued an ex parte order enjoining and restraining the defendants

> "[f]rom engaging in, advertising, assisting in or causing the *offering of any courses or classes of instruction, or engaging in*

*any form of educational instruction,* or offering or providing any credits, awards, certificates or degrees for any individual except for presently enrolled students . . . ."

Exhibit P. 18 (emphasis supplied). The construction of the statute and regulations set forth in the Board's pleading, filed on its behalf by the Attorney General of New Jersey, leaves no room for limiting instructions. It requests a pervasive prior restraint on engaging in any form of instruction.[26]

The next point to be noted is the posture of the case when the district court made the order appealed from. The district court addressed not a final hearing, but an application for a preliminary injunction. *Pullman* teaches that when a state statute or regulation may be construed definitively by a state court in a manner which may avoid a conflict with a federal constitutional provision it is sometimes appropriate to avoid a final but possibly erroneous federal court interpretation of the statute, and a possibly unnecessary constitutional decision. But the doctrine requires retention of jurisdiction, 312 U.S. at 501, 61 S.Ct. at 645, for the obvious purpose of preserving the plaintiffs' choice of a forum for the vindication of federal rights clearly infringed by the state construction ultimately adopted. *See England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

Here the district court has not construed the state statute or regulations at all. It has done no more than tell the Board that its construction, announced authoritatively in its state court complaint, goes further than the first amendment permits, and so construed may not be enforced. This preliminary injunction places no limitation on the power of the New Jersey court to reject the Board's construction in favor of one which would conform to the first amendment.[27] Nor was this a case of an unneces-

---

**26.** The Board does not on this appeal contend that a prohibition such as it sought in the section 18A:68–5 proceeding could survive first amendment scrutiny. *See infra,* p. 886.

**27.** The state trial court has in fact substantially rejected the Board's construction. *The New Jersey State Board of Education, et al. v. The Board of Directors of Shelton College, et al., supra.*

sary constitutional law pronouncement, for the Board's action, had it been successful, would have imposed on the parents, the students and the teacher an irreparable interference with their exercise of rights protected by the religion clauses. If prior to final hearing in this case the New Jersey appellate courts should adopt a narrowing construction avoiding the constitutional issues raised by the Board's attempt to prohibit all teaching at Shelton, no legitimate New Jersey interest will have been invaded by the pendency of the preliminary injunction, and at final hearing the need for federal injunctive relief on those issues may be moot.

█ In these circumstances there is no merit to the Board's contention that the *Pullman* doctrine precluded consideration of pendente lite injunctive relief. The only issue in the state's appeal is whether, substantively, the preliminary injunction went too far. The court ruled:

I conclude that plaintiffs have every likelihood of prevailing on the merits insofar as the State Board seeks to close Shelton College by forbidding it to advertise and teach, that all of the plaintiffs are threatened with immediate and irreparable injury to their rights of free speech and right to freely exercise their religion, that none of the other parties to this action are prejudiced in any way by Shelton College's continued operation, and that all members of the public at large will ultimately benefit if the constitutional rights of a small religious minority are protected from encroachments by honorable but overly zealous public officials. Preliminary injunctive relief is appropriate.

An order will be entered enjoining defendants from taking or permitting the taking of any action having the effect or designed to have the effect or preventing Shelton College or any of its employees, servants and agents from engaging in any religious, teaching or educational activities or from publicizing or advertising such activities.

Provided that no action is taken in the pending State Court proceeding which would in any way curtail plaintiffs' rights as defined in the order mentioned above, there will be no need to enjoin the prosecution of that proceeding.

482 F.Supp. at 979. In its brief on appeal the Board argues that this very limited grant of injunctive relief was an abuse of discretion. The Board contends

. . . in order to make a colorable claim under the Free Exercise Clause, there must be an interference with the religious beliefs of the complainant. See *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In the instant matter, it is clear that the statutory scheme at issue in no way interferes with any religious beliefs of the plaintiffs. They are free to teach and express any doctrine or belief that they desire, completely without interference from the state.

Appellees' brief at 33. This argument, however, simply misstates the record, for exhibits P–17 and P–18 plainly and unequivocally show that the Board sought in the state court a prohibition against any instruction and any advertising. Enforcement by the Board of the broad grant of that relief is all the district court enjoined. The Board's brief does not defend the propriety of such relief. Indeed its misstatement of the record obliquely concedes that the district court was correct in predicting a likelihood of ultimate success on the merits. We agree that success on the merits in resisting a prior restraint against all teaching and all advertising is likely. The district court committed no abuse of discretion in awarding the preliminary injunction preventing the board from enforcing such a restraint.

## VI.

### *The Plaintiffs' Appeals*
### A. *Appeal No. 80–1253*

The district court also ruled:

So long as there is no interference with Shelton College's religious teaching or educational programs, this Court should abstain from deciding the remaining constitutional issues and permit them to be decided in the pending State Court action. This court will retain jurisdiction pending completion of the State Court proceedings in the event further interim relief should be required.

482 F.Supp. at 980.[28] Thus the present status of the case is that a *Pullman* type stay has been entered, with a retention of jurisdiction to consider further injunctive relief when the state court construes the statute and regulations. The plaintiffs point out, quite correctly, that this order is a denial of a large part of the injunctive relief which they requested. They urge, moreover, that its entry was error. All of the factors bearing on their choice of a federal forum discussed in Part IV above, they urge, are equally relevant with respect to the additional relief they sought. That relief includes a decision on plaintiffs' entanglement and free exercise claims.

The plaintiffs' appeal requires that we consider, in a first amendment context, the interrelationship between the *Pullman* abstention doctrine and the standards for the award of preliminary injunctive relief. Since, as we have already noted in Part V, a grant of pendente lite relief is not a final interpretation of state law by a federal court, and leaves the state court entirely free to place any construction on its law, limiting or otherwise, which it determines to be consistent with the first amendment, *Pullman* considerations have very little weight at the preliminary injunction stage. Once the court has concluded that an immediate dismissal on *Younger* grounds is inap-

propriate, a motion for preliminary injunctive relief, especially in first amendment contexts, ought, we think, to be considered without regard to the separate question whether a *Pullman* stay of final hearing is appropriate. Assuming the case is not to be dismissed outright, the district court should be guided by the classic requirements for a preliminary injunction:

> The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits.

*Doran v. Salem Inn*, 422 U.S. at 931, 95 S.Ct. at 2567. Our review is confined to a determination whether the trial court abused its discretion in applying the quoted standards. *Doran v. Salem Inn*, 422 U.S. at 931–32, 95 S.Ct. at 2567–2568.

We noted in Part III that the plaintiffs' entanglement and free exercise clause claims are significant; in Part IV that the remedies available in a state tribunal, especially interlocutory appellate remedies, are problematical, and Supreme Court review of a state preliminary injunction is unavailable; and in Part VI A above, that the plaintiffs have been left in somewhat of a dilemma by the limited preliminary relief which was granted. On the other hand, as the district court noted, New Jersey has a significant interest in protecting both the consumers of education and the public which may rely upon the certification of proficiency implicit in the award of a degree. Certainly the likelihood of success on the merits, with respect to the degree granting aspect of the case, was not as clear as was the claim to be free to teach and to advertise.[29] Moreover the district court did

---

**28.** On January 7, 1980 the court entered an order noting that the action was stayed pending proceedings in the Superior Court of New Jersey, directing the district court clerk to list the case as terminated for administrative purposes, but preserving to the parties the right to reopen. This order is consistent with the retention of jurisdiction requirements of the *Pullman* doctrine.

**29.** In view of the substantiality of plaintiffs' claim that, by endeavoring to prohibit the granting of credits, New Jersey is attempting to intrude on matters properly the province of Florida law, the district court did not abuse its discretion in permitting Shelton to continue to award credits toward a Florida degree. The New Jersey regulations prohibit the award of credits leading toward a New Jersey degree. Apart from the New Jersey degree, the credits are of no significance to New Jersey. Credits

not leave the plaintiffs entirely unprotected. It reserved jurisdiction to consider further applications for interim relief. Given the competing considerations facing the district court, we cannot hold that refusing to grant additional pendente lite relief, when on January 4, 1980 the district court acted initially, was an abuse of discretion.

■ The plaintiffs also urge that rather than staying final hearing, the district court, "in aid of its jurisdiction, or to protect or effectuate its judgments", 28 U.S.C. § 2283, should have enjoined the section 18A:68–5 proceeding entirely. We reject this contention. The decision to stay the federal court action while a New Jersey state court was given the opportunity to construe that state's statute and regulations was within the permissible range of district court discretion.

### B. *Appeal No. 80–2703*

The plaintiffs, on November 20, 1980, applied to the district court for additional preliminary injunctive relief, and that appeal was referred to this panel. Thereafter the appeal was dismissed. Thus we do not address any of the issues to which it was directed.

### VII.

In No. 80–1253/54 the order appealed from will be affirmed. In No. 80–2703 the appeal has been dismissed. Each party will bear its own costs.

### APPENDIX

### A GUIDE FOR OBTAINING THE BASIC INFORMATION FOR APPRAISING NEW JERSEY INSTITUTIONS OF HIGHER EDUCATION

#### SCHEDULE A

I. Introduction

The questions included in this guide outline the minimum information needed by the State Department of Higher Education before it may proceed with the processing of a request for licensure and for authority to grant an undergraduate degree. A written report based on this guide should be submitted to the Department of Higher Education at least three weeks prior to the scheduled appraisal visit. Four copies are needed. The appropriate regulations and standards should be consulted as each section of schedule A is completed.

When making an application for authority to grant a graduate degree, this guide must be utilized in conjunction with schedule B (a separate document). Any additional information felt to be helpful in interpreting the institutional purposes and programs should certainly be furnished. Four copies of such information should be submitted.

II. Report of the College as a Whole (Directions)

Institutions requesting an initial license to operate shall answer the questions in terms of the proposed institution.

Institutions requesting license renewal shall answer all questions. Where questions are not applicable, please indicate why.

Institutions requesting approval of a new program should confer with departmental representatives concerning the extent to which this section should be filled out.

1. Statement of Purpose

a. What are the educational purposes or functions of your institution, as stated in the articles of incorporation? Quote the complete statement from the incorporation papers.

b. What other statements of purpose exist? Attach sections from the college catalogue and other documents describing these statements.

are not by regulation transferrable between accredited New Jersey institutions. One accredited New Jersey college has no statutory or regulatory obligation to recognize course work completed at another accredited New Jersey school. If Florida chooses to recognize course work completed at Shelton College, the New Jersey Board of Higher Education has no interest in interfering with Florida's regulatory prerogative.

c. When were your statements of purposes last systematically reviewed? Who participated in that review and what institutional constituencies were represented?

d. If the institution has a long-range plan for the attainment of its purposes, include it and the proposed schedule of implementation.

e. If the institution is affiliated in any way with a religious organization, please describe the precise nature of the relationship.

2. Administrative Organization

a. Briefly describe the administrative organization of the institution, including the functions and responsibilities of each administrative officer.

b. Attach a statement giving names, occupations, and length of term of your governing board and advisory committees.

c. Briefly describe the governance processes of the institution and the roles and responsibilities of the various institutional constituencies.

d. To what extent is the institution involved in cooperative programs with other institutions? Explain how these efforts relate to the purposes of the institution.

3. Finances

a. Include a copy of your financial summary, using the form prescribed in Part V Financial Summary.

b. Describe your plan for long-range financial development.

c. Include copies of the proposed budget for the current and next fiscal years.

d. Enclose copies of the latest C.P.A. audit.

e. Briefly describe the insurance program of the institution.

f. Explain significant increases or decreases in the operating budget occurring in the three year period covered by the financial summary.

4. Educational Programs

a. List the educational programs offered with approximate enrollment. Include the number who completed each program during the last academic year. Include summer, evening, and extension work.

b. Describe the course requirements for each program; what are the requirements for admission and graduation from each program. Attach sections from the college catalogue.

c. What is the total number of classes at the time of the report, including extension and noncredit classes? Copy the form below in answering and attach a copy.

Number of classes with enrollment of:

| | |
|---|---|
| Under 10 .............. | From 10–25 .............. |
| From 26–50 ............ | From 50–100 .............. |
| Over 100 .............. | Other arrangements ........ |

d. What provisions are made to ascertain that students have mastered adequately the basic skills needed to do college work?

e. What remedial programs are provided for students with academic weaknesses?

f. Are any programs or classes given off campus? Explain.

g. What are your policies concerning transfer of credit from other institutions?

h. Are all of the courses listed in your catalogue regularly offered? If not, explain. What procedure is followed in determining which courses will be scheduled? How many courses are listed in the college catalogue; how many are offered the present semester?

i. What provision is made for evaluation of student progress? Explain how information concerning the standards of evaluation and examination procedures, and so forth, are made available to students. Attach representative written materials.

j. Is any special recognition given to students with high scholarship? If so, what?

k. How many students were dropped for poor scholarship last year? How many were otherwise disciplined for poor scholarship; what disciplinary measures were employed?

1. Describe the processes for the establishment, development, and review of educational policy.

5. Faculty

a. Present information in outline form (not exceeding half a page for each) pertaining to the preparation and experience for each member of the faculty, such as degrees earned, names of the institutions and the dates; major and minor fields of preparation; teaching experience, research projects, and other information bearing upon the suitability of the faculty member to perform the educational activities for which he is responsible.

b. How many faculty members are part time? How many are full time? What is the student/teacher ratio and how is it determined?

c. Include a schedule of responsibilities for each faculty member. (Include research, committee, administrative responsibilities, and so forth, as well as teaching load.)

Indicate number of students enrolled in each course. Copy the form below in answering and attach a copy.

| Instructor | Courses Title | Taught Sem.Hr. Cr. | Number Students Course | Hours of Instruction Per Week Each Lecture/Lab Class | | Other Responsibilities |
|---|---|---|---|---|---|---|
| (Example) James Smith | Math II (Sec A) | 3 | 20 | 3 | | Dept. Chmn. ½ time |
| | Physics II | 4 | 15 | 2 | 2 | Planning Comm. 1 hr. weekly (average) |

Mary Moore Etc.

d. What are the faculty personnel policies with regard to academic freedom, economic security, opportunities for professional growth, responsibilities and conditions of appointment and dismissal and other pertinent information.

e. What are the institutional policies concerning faculty organization, faculty committees, and frequency of faculty meetings? What part does the faculty play in the governance of the institution?

f. What institutional problems have been studied by the faculty during the last five years?

6. Library

a. Enclose a copy of the library policy statement required by library regulation IA.

b. Give a brief description of number of volumes, periodical and specialized journals (current and bound), and newspapers available for use as well as media equipment.

c. Explain the accessibility of the library facilities to faculty and students. What evidence is available about the extent of use of the library by faculty and students?

d. What percentage of the budget has been spent during the past fiscal year for salaries, books and periodicals for the library; for binding and supplies, physical equipment, audio-visual aids supervised by library?

e. What equipment for informational retrieval and storage is available?

7. Students and Student Services

a. What are the admission requirements?

b. Describe the present student body of the institution, including such factors as geographical distribution, economic and occupational status.

c. What per cent of those students entering your institution graduate? Attach a copy of any summaries available concerning the follow-up of graduates.

d. What is the current enrollment? Copy the form below in answering, and attach a copy.

CURRENT ENROLLMENT DATA
ENROLLMENT BY

| Level by Years | MEN | | | WOMEN | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Full time | Part time | Total | Full time | Part time | Total |
| Freshmen | | | | | | |
| Sophomores | | | | | | |
| Juniors | | | | | | |
| Seniors | | | | | | |
| Graduate Students | | | | | | |
| Total | | | | | | |
| Unclassified (Special) [1] | | | | | | |

e. What is the scope of orientation and counseling service?

f. What standardized tests are administered and how are the results used?

g. What health facilities and services are available?

h. What are the policies on tuition, fees and refunds for full-time and part-time students? Attach a statement from the college catalogue.

i. Explain the policies on financial assistance and list the amount of such assistance last year.

j. To what extent do students participate in the governance of the institution?

k. What extracurricular activities, cultural and social, are provided?

8. Physical Facilities

a. Describe briefly the size and character of available buildings and how they are being used.

b. What are the plant needs and plans for expansion?

c. Describe the facilities for faculty offices, administrative offices, and supportive services.

d. What living facilities, if any, are provided.

[1]. But who is permitted to enroll in courses in the regular manner; enrollees in specialized,

e. What laboratory facilities are provided?

III. Report on Proposed New Degree Program (Directions)

Institutions requesting initial authority to grant a degree shall complete this section.

Institutions requesting approval of a new degree program shall complete this section.

Institutions requesting renewal of licensure and approval should complete this section only if new approval is being requested at the same time.

If the information requested has already been supplied in answering questions in section II, do not repeat, but indicate where in your report that information can be found.

1. Objectives

a. What are the objectives of the proposed program as they relate to institutional purposes?

b. What indication of need for this program is there? To what extent do other institutions in this State or nearby states, public and private, meet the need?

c. Compare the proposed program with similar programs of high quality (if they exist) offered by other institutions.

short-term and noncredit programs.

2. Educational program

a. Describe the program, and give models of typical programs.

b. What are the requirements for admission and graduation?

c. What special resources are available or need to be secured?

3. Faculty

a. What faculty is to be utilized? What are their special qualifications? From where are they to be drawn?

4. Finances

a. What are the estimated costs of the program?

b. What is the source of the estimated income?

c. Enclose a proposed budget for the new program.

d. Give a long-range plan (at least five years) summarizing the financial aspects of the program.

5. Physical Facilities

a. What physical facilities are to be utilized?

b. If the program is in the physical, natural, behavioral, or applied sciences, or technology, what laboratory facilities are available? Are there plans for additional laboratory facilities?

6. Library

a. What specialized material, (books, periodicals, journals, or other) is available for the new program?

IV. Exhibit Material to be Submitted

1. A copy of the incorporation papers of the institution.

2. A copy of the rules or statutes under which the institution operates. A copy of the bylaws of the governing board.

3. Class schedules for all semesters or sections of the current year.

4. Faculty personnel policies and salary schedules.

5. Admission blanks.

6. Student and faculty handbooks.

7. The official college catalogue.

8. Student accumulated record form.

9. Summary of information about the academic achievements of your students. Comparisons with colleges judged to be comparable are encouraged.

10. Summary of scholastic achievements of entering freshmen for the past academic year showing the rank of each student in high school graduating class.

11. Table showing distribution of final grades by individual teachers within each department for the past semester.

V. Financial Summary

1. Current Income

This includes all funds which are expendable for the current operations of the institution. It does not include receipts to be added to the loan funds, endowment and other nonexpendable funds, annuity funds, and funds for plant additions.

a. Education and general income: All current general income which may be used for the instructional, research, and extension and public service programs, and for general expenses of the institution. Also all current restricted income to the extent such funds have been expended during the period covered by the statement.

1. Student tuition and fees: All tuition, general and specific fees paid by or for the students to the institution for educational services. Does not include charges for services rendered by resident halls, dining rooms, student hospitals, or other auxiliary enterprises. Include all fees assessed whether or not collected. Fee and tuition remissions or exemptions should be assessed and reported as student fees income although it is not intended to effect collection from the student. A corresponding amount, as well as the amount of other student aid granted out of current income, should be known as expenditures in the statement of current expenditures. Include

student fees paid by Veterans Administration and by other governmental units.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

2. Governmental appropriations: Income received from governmental sources out of governmental revenues which are expendable for general educational purposes. Income from governmental agencies for contract research and services should not be shown here but should be reported under the category: e. Contract research and services. Do not include capital outlay appropriations.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

3. Endowment income: Income earned on the investment and other nonexpendable funds available for general educational purposes. Do not include earnings designated for other than educational and general, such as, auxiliary enterprises, student aid, loan funds, or plant additions; those items are included elsewhere in "Current income."

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

4. Gifts and Grants: All unrestricted gifts expendable for educational purposes. Also grants for this purpose to the extent that they were expended during the period covered by this report. Do not include funds for research and special programs.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

5. Contract research and services: All income from research projects organized separately from the departmental research conducted as part of the instructional program.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

6. Contributed services: Include estimated monetary value of nonsalaried services in terms of salary equivalencies. In institutions organized and managed by religious orders, societies, or similar groups, the personnel of the institution may receive no monetary compensation for their services.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

7. Departmental services and sales: Incidental income of educational departments resulting from services performed, the sale of publications, and other similar activities.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

8. Organized activities relating to educational departments: Income of all activities organized and operated in connection with educational departments and conducted primarily for the purposes of giving academic instruction to students (that is, medical school hospitals, home economics cafeterias, agricultural college orchard, dental clinics, demonstration schools, and so forth). Where these enterprises are not conducted primarily for educational purposes, the activity should be classified as an auxiliary enterprise.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

9. Any additional items not mentioned above which are considered a regular part of the educational and general income at your institution. Describe each.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

TOTAL EDUCATIONAL AND GENERAL INCOME (1–9)

2. Auxiliary Enterprises Income: Gross income of enterprises existing primarily for students, faculty, and staff (dining halls, dormitories, bookstores, athletics, student unions, and so forth).

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

3. Student Aid Income: All income specifically designated for scholarships, fellowships, prizes, and other purposes. Such income is received usually in the form of gifts, grants, and endowment income designated for this purpose. Additions to loan funds are not included here.

Percent of total income:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

GRANT TOTAL CURRENT INCOME (1, 2, 3)

4. Current Expenditures: Educational and general expenditures—All current expenditures of all departments and activities of the institution concerned with the educational program; with the counseling, guiding and testing of students; and the maintenance of records of student achievement; public services and information, and administrative and general expenses.

a. General administration: Expenses of the general executive or administrative officers of the institution including the governing board and the president. The expenditures of the offices of the registrar, student personnel dean(s) may be reported here if not classified as student services expenditures.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

b. Instruction and departmental research and specialized educational activities: All expenses for instructional programs, and for that research which is conducted in educational departments and not separately budgeted and financed as organized research; faculty salaries.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

c. Libraries: Total expenditures for libraries, including salaries and wages, supplies and expenses, books, microfilms, periodicals and binding.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

d. Plant operation and maintenance: Cost of operating and maintaining the educational and administrative buildings including classrooms, laboratory and other instructional areas; libraries; and administrative buildings, and residences furnished rent free to staff. Expenditures distributable or directly chargeable to auxiliary enterprises and activities other than educational and general are charged to the appropriate activities.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

e. Student services: Expenses for the administration of student activities, admissions; student records; student counseling and testing; the net cost to the institution of student organizations and activities.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

f. Organized research: Cost of separately budgeted and financed research projects and all separately organized research divisions, such as, research bureaus, research institutes, and experiment stations.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

g. Public service and information: Expenditures for publicity, public relations and other public services and information; and development programs, college promotion, and fund raising. Include such specific activities as public lectures, radio programs, public meetings, and so forth.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

h. General institutional: Expenses of all remaining noninstructional or educational general expenditures of the institution as a whole, exclusive of libraries, physical plant operation and maintenance, student aid, auxiliary enterprises, intercollegiate athletics, and annuity payments.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

i. Other: Other expenditures not mentioned above which are considered a regular part of the educational and general expenditures at your institution. Describe.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

TOTAL EDUCATIONAL AND GENERAL EXPENDITURES (a-i)

5. Auxiliary Enterprises Expenditures: Gross expenses of these enterprises. Physical plant, general expenses, administrative charges, and other indirect costs of the enterprises should be included.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

6. Student Aid: All expenditures for scholarships, fellowships, and prizes. Do not include student loans. Student aid in the form of remission of tuition and fees or the exemption from the payment of such charges should be reported. Service scholarships where service is required should be assigned as expense of the department where service is rendered.

Percent of total expenditures:

| Current Year | One Year Ago | Two Years Ago |
|---|---|---|

GRAND TOTAL

ROSENN, Circuit Judge, concurring and dissenting:

In this case the district court took the extraordinary step of interfering in a pending state proceeding because it found that portions of the state court's preliminary order imposed "both great and immediate" irreparable harm—harm sufficient to warrant federal interference under the narrow, *Younger*-based exception to the general *Younger*[1] rule. The district court committed no reversible error in thus exercising its narrowly circumscribed equitable discretion, and I would affirm the district court in all but one respect that I shall discuss hereinafter. *See* Part III, *infra* at 908.

However, even in concurring I am constrained to write separately, because in affirming the award of injunctive relief against the New Jersey State Board of Higher Education (the Board), the majority holds that the presence of plaintiffs in the

federal action who were not parties to the state proceeding immunized Shelton's federal complaint from the limiting principles of *Younger*. By reaching out to fashion such a rule, the majority has prepounded and answered a question of first impression in this circuit without the benefit of prior consideration by the district court or significant briefing by the parties. Moreover, in so doing the majority endeavors to distinguish or discredit a substantial body of law to the contrary set forth in cases factually identical[2] or analogous[3] to this one. Finally, under the majority's rule, this court becomes the first to hold that direct nonparty interference in a state-court proceeding is *not* subject to *Younger* considerations. I respectfully disagree with the majority's adoption of this rule and therefore I cannot join in Part IV of its opinion.

I would also vacate one portion of the district court's order and I dissent from the majority's decision insofar as it upholds this portion of the order. Thus I cannot join in Parts V and VI A of the majority's opinion. In all other respects I would affirm the district court's order and I join in Parts I, III, and VI B of the majority's opinion.

I.

This case presents a question of whether the injunctive power of a federal court is available as a means of relief from state agency action in a state court to enforce an allegedly unconstitutional state licensing scheme. The federal plaintiffs in this action sought not to restrain the Board from pursuing a *threatened* state suit; rather, they invoked the power of the federal court to halt the Board's pending state-court action against the board of directors and the two principal officers of Shelton College

---

1. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

2. *Corpus Christi Peoples' Baptist Church, Inc. v. Texas Dep't of Human Resources*, 481 F.Supp. 1101, 1110 (S.D.Tex.1979), *aff'd mem.*, 621 F.2d 438 (5th Cir. 1980).

3. *See Hicks v. Miranda*, 422 U.S. 332, 348–49, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975);

*Allee v. Medrano*, 416 U.S. 802, 830–32, 94 S.Ct. 2191, 2207–08, 40 L.Ed.2d 566 (1974) (Burger, C. J., concurring); *ACLU v. Bozardt*, 539 F.2d 340, 343 (4th Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); *Doe v. Maher*, 414 F.Supp. 1368, 1372 (D.Conn. 1976) (three-judge court), *vacated on other grounds*, 432 U.S. 526, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977) (per curiam).

(Shelton). Because the New Jersey state court had awarded the Board preliminary injunctive relief prior to the award of any relief in the federal court, the latter also considered the federal plaintiffs' request for relief from the Board's enforcement of the state court's injunctive order.

In affirming the district court's order, the majority reaches its result by applying a legal rule which does not appear in the district court's opinion. The majority concludes that this case does not present an occasion for *Younger* dismissal because most of the federal plaintiffs were not parties to the state proceeding. This, according to the majority, gives the federal-only plaintiffs [4] a right to a federal remedy for the same reason that one party may obtain federal relief from threatened prosecution under an unconstitutional state criminal law while at the same time another party may be prosecuted under the same law challenged in the federal suit. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928–29, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975); *Steffel v. Thompson,* 415 U.S. 452, 455–56, 94 S.Ct. 1209, 1213–14, 39 L.Ed.2d 505 (1974). Examination of the relief granted in this case, however, belies any such similarity between this appeal and *Steffel* or *Doran*—not because the federal-only plaintiffs have no separate interests, *see, e. g.,* minority op. at 903 n.13, 905–907 *infra,* but because neither *Steffel* nor *Doran* authorized such separate federal-only plaintiffs to interfere directly in state-court proceedings.

The New Jersey Superior Court action was brought by the Board pursuant to N.J. Stat.Ann. § 18A:68–5 which specifically empowers the Board to sue in that court to restrain a corporation from carrying on the business of instruction for the purpose of conferring a degree without a state license.[5] In the suit to "restrain the corporation" the Attorney General found it sufficient to name as defendants not the corporation, but simply its Board of Directors ("the principal governing body of Shelton College"), its president and chief executive officer, and its chancellor.

The federal complaint was brought by several parties, one of whom was the corporation itself. In addition to a temporary restraining order, the complaint sought, *inter alia,* the following relief:

(1) That the Court declare that the action of the defendants in imposing the aforesaid requirements of the statutes and regulations is unconstitutional;

\* \* \* \* \* \*

(3) That the Court preliminarily and permanently enjoin the defendants from applying the aforesaid statutes and regulations to the religious educational ministry which is Shelton College;

\* \* \* \* \* \*

The district court ordered that the defendants be enjoined from taking, or permitting the taking of, any action designed to have the effect of preventing Shelton College

(a) from engaging in any educational activities or in any religious teaching;

(b) from publicizing or advertising such activities, or

(c) from certifying to a student the satisfactory completion of work in a course or other educational activity through awarding that student a credit therefor.

> When it shall appear that any corporation is carrying on the business of *such* instruction or teaching [*viz.,* "instruction or learning . . . for the purpose of admitting any person to the grade of a degree" (*id.* § 18A:68–3)] or conferring any such degree, or giving any such diploma without such license, *the board* of higher education . . . *may institute a civil action* in the superior court *to restrain the corporation* from the transaction of any such business. . . .
> (Emphasis added.)

---

4. I use the term "federal-only plaintiffs" to designate the Churches, students, parents and teacher. Shelton, the other federal plaintiff, bears a closer relation than any of these to the state-court defendants. For this reason, all members of this panel, as well as Shelton itself, treat Shelton as a state-court litigant in all but the most technical sense. *See* majority op. at 871, 877, 881 n.22; minority op. at 896, 900, *infra.*

5. N.J.Stat.Ann. § 18A:68–5 provides in pertinent part:

Thus, Shelton and the other federal plaintiffs obtained relief designed to prevent enforcement against Shelton's managing body in the pending state proceeding of either the state licensing scheme or the preliminary state-court order.[6] For this reason, the federal proceeding squarely implicated *Younger* principles. Given this undisputed set of facts, the presence of additional parties in the federal action could not, in itself, obviate the need for the district court to consider dismissal.

The rule in *Younger v. Harris* is designed to "permit state courts to try cases free from interference by federal courts," 401 U.S., at 43, 91 S.Ct. at 750, particularly where the party to the federal case may fully litigate his claim before the state court. Plainly, "[t]he same comity considerations apply," *Allee v. Medrano*, 416 U.S. 802, 831, 94 S.Ct. 2191, 2208, 40 L.Ed.2d 566 (1974) (Burger, C. J., concurring), where the interference is sought by some, such as appellees, *not parties to the state case.*

*Hicks v. Miranda*, 422 U.S. at 349, 95 S.Ct. at 2291 (emphasis supplied).[7] Nevertheless, portions of the preliminary relief awarded by the New Jersey court imposed irreparable harm sufficiently "great and immediate" to warrant federal interference even under the narrow exception to the policy of judicial nonintervention set forth in *Younger* itself.[8] In announcing its alternative

---

**6.** It is from this relief that the Board appeals. It is to this relief that the majority adverts when it concludes, in Part IV, that the district court committed no error. Thus it is the propriety of this relief that forms the crux of the *Younger* issue on this appeal.

**7.** The interests of the federal-only plaintiffs in this case may or may not fall within the category of interests sufficiently "intertwined," 422 U.S. at 348-49, 95 S.Ct. at 2291, with those of Shelton to require *Younger* dismissal on the basis of a simple application of *Hicks* alone. *But see Bickham v. Lashof*, 620 F.2d 1238, 1243-45 (7th Cir. 1980). However, in light of the circumstances discussed fully below it is unnecessary to rely on *Hicks* alone in order to conclude that, with regard to the relief at issue in the Board's present appeal, *Younger* principles were as applicable to the federal-only plaintiffs as they were to Shelton.

**8.** *Younger* teaches that there is a narrowly circumscribed class of "extraordinary circumstances in which the necessary irreparable injury can be shown" that would warrant federal interference in pending state proceedings. 401 U.S. at 53, 91 S.Ct. at 755. Identification of such "unusual situations," *id.* at 54, 91 S.Ct. at 755, calls for an exercise of equitable discretion, albeit a discretion circumscribed by "Our Federalism." *Id.* at 44, 91 S.Ct. at 750. The district court in this case entered its order because failure to award any relief would mean that "[b]y state fiat a religious community will be destroyed." 482 F.Supp. at 974. Operating solely within the narrow confines of equitable discretion that comprise *Younger's* self-contained exception, the district court granted relief to "prevent the immediate irreparable violation of plaintiffs' constitutional rights." *Id.* at 979. Given the absence of any reason to believe that its findings are clearly erroneous, I find no abuse of discretion in the district court's conclusion that because some of the rights impaired by the preliminary injunction of the state court were so important, and the threatened injury to those rights so irretrievable, plaintiffs have stated a cause of action within the confines of the *Younger* exception for "both great and immediate" irreparable harm. 401 U.S. at 46, 91 S.Ct. at 751. As the district court put it, this was a case in which, at least with respect to some of the requested relief, the *Younger* and *Pullman* doctrines "must give way." 482 F.Supp. at 978.

No mention is made by the district court of any reason why distinctions among the interests of the multiple parties in this case made *Younger* inapplicable. This absence is telling in the face of the majority's assertion that, for purposes of *all* the relief at issue in this case, departure from *Younger* was required by the existence of such separate interests. Even under the majority's legal theory, there must be a heavy factual component to the issue whether, as to any particular type of relief, the relevant interests are so separate as to render *Younger* inapplicable. Cf. *County of Imperial v. Munoz*, 449 U.S. 54, 58, 101 S.Ct. 289, 292, 66 L.Ed.2d 258 (1980) (remanding for factual determination of whether federal-only plaintiffs were "strangers" to the state-court suit); *Allee v. Medrano*, 416 U.S. at 832 n. 8, 94 S.Ct. at 2208 n. 8 (Burger, C. J., concurring) ("There is no need now to attempt to further define those situations in which it would be proper to impute the state criminal prosecution of one who is not a federal plaintiff to one who is. The association of the state criminal defendant and the federal plaintiff necessary for imputation will depend upon facts of joint activity and common interest."). Because the district court rendered its decision without recourse to the majority's legal theory, it would appear that under the majority's theory at most a remand is appropriate, not affirmance.

rationale for reaching the same result, however, the majority here fashions a rule that goes beyond anything to be found in *Doran v. Salem Inn, Inc.*, and *Steffel v. Thompson*, the cases upon which it relies.[9] For the majority effectively holds that future state-court defendants whose federal injunctive suits are barred by *Younger* need only add to their federal complaint new parties who have separate interests, in order to obtain exactly the same relief that *Younger* would otherwise bar. Thus, the new parties can now assert not only their *own* rights in a federal court proceeding; they may also bar the state plaintiff from litigating these same issues against the *original* state de-

fendant in state court, under threat of contempt sanctions in the federal court.[10]

In *Doran* the Supreme Court reversed the grant of a preliminary injunction to a tavern operator, M & L Restaurant, Inc., which had chosen to challenge the constitutional validity of a town ordinance first by filing a suit for federal injunctive and declaratory relief, and then, before obtaining preliminary federal relief, by violating the ordinance and subjecting itself to criminal prosecution in the state courts. M & L was one of three federal plaintiffs all seeking the same relief. However, the other two, Salem Inn, Inc., and Tim-Rob Bar, Inc., re-

9. I recognize that the majority would have its opinion read only for the uncontroverted propositions that (a) the federal-only plaintiffs have, in some significant sense, interests distinct from Shelton, and (b) that separateness is sufficient to satisfy the test for entertaining a federal proceeding *not* directed toward interfering in a pending state proceeding. Unfortunately, this appeal does not embody a dispute whose resolution can be reached by application of those propositions alone. *See* minority op. at 897 n.6, *supra.*

10. The majority's opinion directs that *Younger* considerations be eschewed whenever a state-court defendant asks a federal court to restrain pending state litigation against him, so long as he adds a new plaintiff to his federal complaint, one who is interested in affecting the outcome of the original state proceeding and who may have sufficiently distinct interests to meet the *Doran* test in a hypothetical separate suit (*i. e.*, a federal proceeding that would *not* be aimed at directly interfering in the pending state proceeding). I believe such a proposition must be rejected. However, what the majority *holds* is a different matter, because the facts upon which it affirms the district court are narrower. The majority's holding is an affirmance, on its multiple-party separate interest theory, of a federal injunction directed at preventing the Board from enforcing a preliminary order arising out of the then-pending Superior Court proceeding. Insofar as interference with other types of state enforcement action is not here enjoined, much of what the majority says can be characterized as dictum.

Characterization as dictum fails to neutralize the fundamental problem with the majority's opinion, however, because application vel non of the majority's legal rule does not turn on any factual peculiarities unique to this case. For instance, at 885–86, the majority implicitly holds that *Younger* considerations are inapplicable to *any* part of the federal complaint. Nor can application of the majority's rule be spe-

cially justified, as the majority suggests at 878, on the basis of the prospective effect of the state-court's order. There is no basis in *Younger* jurisprudence for the majority's attempt to posit a rigid distinction between (a) cases such as this, where the federal plaintiff seeks to enjoin the restraining effect of the prior state-court order on *future* acts, or *future* enjoyment of federal rights, and (b) other cases where the federal plaintiff seeks to enjoin the retributive effect of state-court proceedings previously initiated due to *past* acts that occurred prior to the filing of the federal complaint. *See Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (*Younger* dismissal was called for even though federal relief was issued only after the pendente lite state-court order had already deprived the federal plaintiff of child custody); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (reversing and remanding, for consideration in light of *Younger*, a federal injunction directing the return of property that had already been seized pursuant to a pendente lite state-court order); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (vacating and remanding, for consideration in light of *Younger*, a federal injunction enjoining the execution of a state court order closing a theater). *Cf. Atlantic Coast Line R. R. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970) (a federal injunction to enjoin a state-court plaintiff from giving effect to or availing itself of the benefits of a state court injunction is "an injunction 'to stay proceedings in a State court' "), *quoted in County of Imperial v. Munoz*, 449 U.S. 54, 59, 101 S.Ct. 289, 292, 66 L.Ed.2d 258 (1980). Understandably, the majority has not sought to emphasize its attempted distinction. *But see* majority op. at 878. The text of my concurrence elaborates fully the perceived error in those other arguments that the majority *does* emphasize.

frained from violating the challenged ordinance until they had obtained federal preliminary injunctive relief enjoining the town's prosecution of the federal plaintiffs. The federal district court concluded that Salem Inn and Tim-Rob were entitled to preliminary injunctive relief. In this respect its holding was affirmed by the Second Circuit and the Supreme Court. The latter noted that since there were no ongoing state criminal proceedings against these two plaintiffs, they were entitled to choose a federal forum as the one in which they would seek a declaration that the state statute was unconstitutional. The Court was troubled, however, because

> prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction; unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm. Moreover *neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute.*

422 U.S. at 931, 95 S.Ct. at 2567, (emphasis added). Thus, the Court approved the use of federal injunctive power to negate the state's future enforcement power as to Salem and Tim-Rob, the parties who, prior to the award of federal injunctive relief, had refrained from violating the challenged ordinance. This use of the federal injunctive power, however, was to have no application to the state's enforcement of the ordinance against M & L; "the State is free to prosecute others who may violate the statute." *Id.*

The lower federal courts had reached an opposite result with respect to the power of the state to prosecute M & L, the pre-injunction violator of the statute who was also a federal plaintiff. Insofar as Salem

and Tim-Rob were entitled to have the constitutionality issue heard and decided in the federal forum, the district court found it "anomalous," 364 F.Supp. 478, 482 (E.D.N.Y.1973), and the Second Circuit found it to be inequitable and wasteful of the state's judicial resources, 501 F.2d 18, 22 (1974), to deny M & L the same federal forum, *Younger v. Harris* notwithstanding.

The Supreme Court, rejecting the lower court's results with respect to M & L, reached a conclusion that is compelling in this case. It held that "the interest of avoiding conflicting outcomes in the litigation of similar issues, while entitled to substantial deference in a unitary system, must of necessity be subordinated to the claims of federalism in this particular area of the law." 422 U.S. at 928, 95 S.Ct. at 2566.

Similarly, the plaintiff in *Steffel v. Thompson* was able to obtain federal declaratory relief from threatened state prosecution, even though the acts of his companion, Becker, had already prompted the local authorities to begin a criminal prosecution against her based on the very same policies challenged by Steffel in his federal complaint.

In *Doran*, the pendency of the federal suit brought by Salem and Tim-Rob did not preclude the imposition of criminal sanctions against M & L; in *Steffel*, the state's ability to prosecute Becker was independent of Steffel's federal suit. The only federal plaintiffs whose federal suits were *not* barred in those cases were those who were not defendants in ongoing state proceedings. These cases therefore demonstrate that one party cannot be denied a federal forum merely because there is a threat that, in an ongoing state proceeding, the state court may reach a legal conclusion inconsistent with that of the federal court on a matter of federal law as applied to similar activities engaged in by separate individuals.[11] *Doran* requires, however, that the

---

**11.** There can be no such inconsistent conclusions, however, unless each system, state and federal, is permitted to generate its own legal product in any existing case without mid-litigation interference by a court in the other system

acting on a subsequently-filed suit. There are special exceptions, of course, for subsequently-filed state court proceedings. *See Hicks v. Miranda*, 422 U.S. at 349, 95 S.Ct. at 2291 (where state criminal proceedings are begun

injunctive power of the federal court, properly invoked by one party subsequent to the filing of a state-court action which raises the same legal issue as to other parties, be so circumscribed as not to bar the state court from moving independently in the pending parallel suit.

The majority opinion permits precisely what *Doran* stated could not happen; it allows the federal court to dictate the terms by which the state court will resolve the concrete dispute between separate parties to the parallel proceeding.

The majority even goes so far as to suggest that because the grant of declaratory relief to a separate party would be "just as disruptive to state enforcement as direct interference in the state proceeding in the form of an injunction," the availability of separate declaratory relief undercuts the "initially appealing" theory that *Younger* generally forbids direct interference in state proceedings. *See* majority op. at 878–79. In advancing this argument the majority lapses into precisely the same error committed by the Second Circuit in *Doran*—an error that required subsequent reversal in the Supreme Court. As previously discussed, *see* minority op. at 898, after the Second Circuit concluded that Tim-Rob and Salem Inn had properly invoked federal court jurisdiction, the court was "struck by the practical wisdom" of affording M & L the same federal forum, notwithstanding the pendency of its state-court criminal proceeding. Because precisely the same constitutional issues would be raised by all three litigants, the "more substantial considerations . . . favor[ed] . . . extending federal protection, at least in this case, to M & L. . . ." Such considerations

included the danger of "contradictory outcomes" in state and federal court. 501 F.2d at 22. This reasoning was unequivocally rejected by the Supreme Court. "[T]he interest of avoiding conflicting outcomes in the litigation of similar issues, while entitled to substantial deference in a unitary system, must of necessity be subordinated to the claims of federalism in this particular area of the law." 422 U.S. at 928, 95 S.Ct. at 2566. Thus, contrary to the suggestion of the majority, *Doran* squarely holds that pursuit of federal declaratory relief cannot "directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." *Id.* at 931, 95 S.Ct. at 2567.

The majority commits a further error. It permits the federal court to dictate the terms of the state-court proceeding at the suit of the very party, among others, whose federal suit was barred by the holding in *Doran*—namely, the state-court defendant.

For purposes of *Younger* analysis here, the corporate plaintiff, Shelton, must be treated as if it were a defendant in the state court. The request for relief by the corporation in federal court is nothing less than a claim that the New Jersey Superior Court fails to offer the state-court defendants an "adequate legal remedy" for their alleged constitutional injury. Inasmuch as the corporation's board of directors was already a party to the Superior Court action, and had the ultimate authority to direct the agents of the corporation to litigate any constitutional issues in federal court, the corporation had no interests separate from those of the state-court defendants. The

against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force); *Doran v. Salem Inn, Inc.*, 422 U.S. at 929, 95 S.Ct. at 2566 (when the criminal summonses issued against M & L on the days immediately following the filing of the federal complaint, the federal litigation was in an embryonic stage and no contested matter had been decided; in this posture, M & L's prayer for injunction was squarely

governed by *Younger*). Since the state proceeding in this case was begun prior to the filing of the federal complaint, these exceptions are irrelevant to this case.

There are also exceptions for subsequently-filed federal complaints; *Younger* spells out these exceptions. *See* note 8, *supra*. My dispute with the majority is not over whether exceptions exist. Rather, I take issue with the notion that *Younger* itself is inapplicable due to the presence of additional parties in the federal action.

corporation had nothing that would give it the independent right to invoke federal relief where, under a *Younger* analysis, the state-court defendants would have had none.

I stress this point because of the serious and far-reaching implications of the majority's holding. Under the majority's rule, a state-court defendant in this circuit will be able to ignore the *Younger* line of cases so long as he is able to enlist additional parties to his federal complaint who profess an interest in the outcome of the state-court litigation. For instance, this means that if the federal complaint filed by M & L in *Doran* were to be filed tomorrow in New Jersey, and its factual allegations were to be assumed true as in the *Doran* decisions, such a complaint could not be dismissed on *Younger* grounds so long as M & L included in its complaint some of its customers, employees, shareholders or officers who were not named as defendants in the state criminal summonses.

For the foregoing reasons, I submit that the majority's reasoning here is squarely at odds with *Doran* and *Steffel*. At least one other court recently has faced the precise question addressed by the majority and reached an opposite result. In *Corpus Christi Peoples' Baptist Church, Inc. v. Texas Department of Human Resources*, 481 F.Supp. 1101 (S.D.Tex.1979), *aff'd mem.*, 621 F.2d 438 (5th Cir. 1980), the district court addressed the question in the context of a suit nearly identical in all respects to this one. The federal suit alleged that state licensing requirements, as applied to two church-owned and church-operated child-care homes, infringed first, fifth, ninth, and fourteenth amendment rights of the federal plaintiffs. Problem children were placed in those homes and, contended the plaintiffs, "saved" through religious instruction. The federal plaintiffs included the church, staff members of the homes, children residing at the homes, and parents of these children. All of the plaintiffs who testified felt that they would be irreparably harmed if the homes were closed by the state.

The federal district court held that *Younger* principles applied due to a pending suit brought by the state agency to enforce the requirements of the licensing scheme. The church was a defendant in the state-court proceeding. Apparently, the children, parents, and staff members were not. "Technically," said the court, the *Younger* doctrine would not apply to these federal-only plaintiffs.

[I]f there were as an additional plaintiff in this case another church operating another child-care institution without a license, raising the same First Amendment contentions through the same attorney, the Court would not invoke the abstention doctrine as to that hypothetical plaintiff simply because the resolution of the pending state case would, as a practical matter, likely resolve the same common issues of law.

It seems to the Court, however, that the facts of this case present an entirely different picture. The bedrock issue is whether or not the state can enforce its licensing requirement for child-care homes when such a home is owned and operated by a church. The rights of the employees of the home, the children in the home and their parents are merely appendages to that central question. If, at the conclusion of the state case, it is resolved that the constitutional rights of the church are paramount to the interests of the state, then the home will continue to operate without the offending licensing requirements. The corresponding rights of the children, their parents, and the staff members of the home will automatically be vindicated. On the other hand, if after proceeding through the state court case, including the rights of appeal to the United States Supreme Court, it is determined that a child-care home must be licensed even if it is operated by a church, then seemingly the collateral claims of the other plaintiffs that they have a constitutional right to either work at or live in such a home or place their children there would become academic, as the home itself would be forced to close. This, therefore, would

seem to be the classic case contemplated by the Supreme Court in *Doran v. Salem Inn, Inc., supra,* when it stated that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them . . . ." 422 U.S. at 928, 95 S.Ct. at 2566.

481 F.Supp. at 1110 (footnotes omitted). The majority seems to attack *Corpus Christi* for its failure to expressly recognize that, for some purposes, the federal-only plaintiffs have free-exercise rights that are not "mere appendages" to the church's rights. I doubt that the district court meant to go so far as the majority says it does. It is more likely that the court was concerned with the limited extent to which the federal-only plaintiffs' rights were implicated in the relief sought by the state-court plaintiffs. In any event, my analysis here depends not at all on total identification of the federal-only plaintiffs' rights with those of Shelton. In no sense do I assert that the case before us is one in which the outcome of the state litigation is "dispositive" of the federal-only plaintiffs' first amendment interests—I explicitly assert the contrary. *See, e. g.,* minority op. at 905–07, *infra.*

Other courts have held federal-only plaintiffs barred by *Younger* in cases where the nature of the relief sought by the federal-only plaintiffs would, as in this case, necessarily interfere with pending state-court proceedings against other federal plaintiffs. In *ACLU v. Bozardt,* 539 F.2d 340 (4th Cir.), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976), "Jane Koe" and the ACLU sought federal equitable relief blocking state disciplinary proceedings initiated against Koe by the disciplinary board of the South Carolina Bar. Plaintiffs also sought declaratory and injunctive relief to prevent the disciplinary board from initiating subsequent similar proceedings against other ACLU attorneys. The Fourth Circuit affirmed the holding of the district court that *Younger* barred federal intervention in the state disciplinary proceedings. In reaching its decision, the circuit court addressed the ACLU's contention that even if dismissal of Koe's complaint was appropriate under *Younger,* dismissal of the ACLU's complaint was improper because the ACLU was not a party to a pending state proceeding.

The ACLU contended that it was asserting the rights of associated attorneys other than Koe who had no state proceedings pending against them, and were therefore not burdened by *Younger* restrictions. The Fourth Circuit, however, found that

> because federal equitable relief is sought by the ACLU on behalf of its members, a grant of federal relief would necessarily have an effect upon all ACLU associates, *including Koe.* To permit the ACLU to assert rights of those associates not bound by the *Younger* restrictions in order 'to obtain federal equitable relief which would necessarily benefit all its associates would directly interfere with the pending state proceedings, and have the effect of circumventing the *Younger* restrictions which bar Koe from seeking direct federal relief. We conclude that *Allee* and *Steffel* were not intended to be interpreted so as to permit a litigant to avoid *Younger* restrictions merely by joining his claim with claims of others asserting a joint interest.

539 F.2d at 343 (emphasis added).

Similarly, in *Doe v. Maher,* 414 F.Supp. 1368 (D.Conn.1976), *vacated on other grounds,* 432 U.S. 526, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977), the district court noted that

> [t]he fact that the adult plaintiffs in this action, with the exception of the intervenor, Linda Robustelli, are defendants in pending contempt proceedings instituted by the [state] commissioner under the authority of [state law] raises a serious issue of abstention in light of *Younger v. Harris* . . . and its progeny. The intervention of Ms. Robustelli, who has been threatened with prosecution, but against whom no action is presently pending, cannot circumvent the issue, for while she may be entitled to declaratory and injunctive relief on a personal basis, *Doran*

*v. Salem Inn, Inc.,* . . . she cannot, under the guise of representing a class, dispense with the *Younger* considerations for those members of the class who are presently being prosecuted. "The requirements of *Younger* are not to be evaded by artificial niceties." *Allee v. Medrano,* 416 U.S. 802, 833, 94 S.Ct. 2191, 2209, 40 L.Ed.2d 566 (1974) (Burger, C. J., concurring in the result in part and dissenting in part). 414 F.Supp. at 1372.[12]

Thus, until today, no court had interpreted *Doran* and *Steffel* as authorizing interference by federal courts in pending state proceedings, even at the suit of parties with interests separate from those of the state-court defendants. Beyond question, the majority has departed from all extant federal court interpretations of the relevant Supreme Court precedent.[13]

## II.

Although the majority's position derives no support from *Doran* and *Steffel,* there remains the question of whether the majority's broader policy analysis discloses an adequate basis for the majority's unprecedented extension of *Doran* and *Steffel.* The majority's position could not prevail absent a strong supporting rationale, for in some ways it conflicts with the foundations of *Younger.* If federal intervention were warranted merely because the request for injunctive relief was "pendente lite," then the basic policy behind *Younger* dismissal—

12. *Allee v. Medrano* involved a request by a union and its members for federal injunctive relief from a persistent pattern of police misconduct, including the filing of criminal charges. *Younger* issues were therefore implicated. For purposes of evaluating some of the requested relief, the record before the Court was inadequate to indicate whether there were pending prosecutions, or even whether the district court intended to enjoin them if there were. The Court therefore remanded the case for further findings and reconsideration in light of *Steffel v. Thompson,* a decision that had not been available at the time of the district court's decision. Chief Justice Burger, in a concurrence, discussed the *Younger* problems that would face the district court on remand:

To the extent that they can prove standing, the individual appellees will be seeking federal court interference in their own state court prosecutions. The union, to the extent that it has standing, will be seeking interference with state court prosecutions of its members. There is an identity of interest between the union and its prosecuted members; the union may seek relief only because of the prosecutions of its members, and only by insuring that such prosecutions cease may the union vindicate the constitutional interests which it claims are violated. The union stands in the place of its prosecuted members even as it asserts its own constitutional rights. The same comity considerations apply whether the action is brought in the name of the union, and there is no inequity in requiring the union to abide by the same legal standard as its members in suing in federal court. If the union were unable to meet the requirements of *Younger,* its members subject to prosecution would have a full opportunity to vindicate the First Amendment rights of both the union and its members in the state court proceedings. Any other result would allow the easy circumvention of *Younger* by individuals who could assert their claims of First Amendment violations through an unincorporated association of those same individuals if the association is immune from *Younger* burdens.

416 U.S. at 830–31, 94 S.Ct. at 2208 (footnote omitted).

13. I would agree that under *Doran* and *Steffel* declaratory relief would have been available to the federal-only plaintiffs alone, without their having to survive the pitfalls of a *Younger* analysis, insofar as they asserted rights independent of those directly at issue in the state-court case. *See also County of Imperial v. Munoz,* 449 U.S. 54, 61, 101 S.Ct. 289, 293, 66 L.Ed.2d 258 (1980) (Blackmun, J., concurring in the result); *Chase National Bank v. City of Norwalk,* 291 U.S. 431, 440, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934). On this appeal, however, this court affirms only the relief of the district court which directly interferes in the state-court proceeding. *See* majority op. at 879. At some future time this court may have occasion to recognize the legal significance of the separateness between the interests of Shelton, on the one hand, and the federal-only plaintiffs, on the other. However, this is not such a case. *Cf. Louisville Area Inter-Faith Comm. for UFW v. Nottingham Liquors, Ltd.,* 542 F.2d 652, 653 n.* (6th Cir. 1976) (affirming the district court's dismissal of a suit brought by the Committee and two individuals to obtain injunctive relief against a state-court injunction restraining the Committee from mass picketing or marching; the federal-only plaintiffs "have no interests apart from the Committee. In the district court, [they] 'sue[d] on behalf of and as representation for' the Committee, rather than on their individual behalf.").

namely, to "permit state courts to try cases free from interference by federal courts," 401 U.S. at 43, 91 S.Ct. at 750—would be undermined.

Thus, it is difficult for the majority to derive any support for its position from the assumption that pendente lite Supreme Court review could only be had if the federal plaintiffs were entitled to attack Superior Court Judge Gruccio's order in federal court. All state-court litigants face the same statutory barrier to pendente lite review in the Supreme Court. To argue the need for a federal forum from this supposed gap in the Supreme Court's jurisdiction is to deny the soundness of *Doran* itself, which was, after all, a suit in which federal pendente lite relief was denied to M & L.

I will assume, arguendo, that the separate interests of the federal-only plaintiffs might have rendered their advocacy of Shelton's cause somewhat different than Shelton's, although this assumption is not supported by factual findings of the district court. Under this assumption, it is arguably reasonable to credit such parties with a greater need for federal relief on behalf of Shelton than the state-court litigants themselves. Thus this case would present a factor militating in favor of federal intervention not found in *Younger* or in M & L's case in *Doran*. But because the district court's injunction would directly interfere with the pending proceedings in the New Jersey court, the federal relief would be an intrusion on the legitimate function of the state court in deciding the constitutional issues arising out of the cases brought before it.[14] Given this conflict, it is not obvious that the correct result is to afford the aggrieved non-parties to the state-court litigation federal injunctive relief. I conclude that the majority's rationale is insufficient to demonstrate the correctness of that result.

The majority's reasoning, apart from its reliance upon *Doran* and *Steffel*, embraces the following steps: (1) these plaintiffs were entitled to bring a section 1983 action for relief from unlawful state interference with their first amendment rights; (2) there is no reason to believe that the plaintiffs could have asserted that claim by intervening in the Superior Court litigation; (3) thus a separate section 1983 action, in a separate state or federal court, was available for "pendente lite" relief; and (4) the possibility of United States Supreme Court review of preliminary relief awarded in federal district court, as opposed to the impossibility of such review of an interlocutory order of the New Jersey Superior Court, rendered the need for the federal forum "significant, legitimate, even compelling," and unopposed by any legitimate state interest.

The first step in this argument, taken as an abstract desideratum, presents no problems. The last step cannot help the majority, for as we have already seen, it proves too much. Minority op. at 902, *supra*. An additional problem with that step, however, is that it is based on an erroneous assumption concerning the scope of the Supreme Court's jurisdiction under 28 U.S.C. § 1257. Just as no petitioner for certiorari can predict with confidence that his case will be heard by the Supreme Court, neither can the majority predict, consistently with its view of the stakes in this case, that the Supreme Court would hold itself statutorily barred from entertaining a request for review of a refusal by New Jersey's appellate courts to reconsider the pendente lite orders of the trial court in this case.

> [T]here are ... situations where the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action rather than

---

14. It is undisputed that the state court was presented with essentially all of the claims asserted in the federal complaint, and that it was competent to hear and decide the federal questions arising out of the instant controversy.

merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come. In these circumstances, if a refusal immediately to review the state court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for purposes of the state litigation.

*Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 482–83, 95 S.Ct. 1029, 1039–1040, 43 L.Ed.2d 328 (1975). The majority assumes that pendente lite relief is justified because state procedures are inadequate to protect irretrievable first amendment rights of these federal plaintiffs. Where a prior restraint is imposed upon the exercise of first amendment rights, each passing day may constitute a separate and cognizable infringement of the first amendment. To this extent, any first amendment infringement that occurs with each passing day is irreparable. Under such an assumption, the refusal of the state appellate tribunals to mitigate the harm caused by the trial court order is a "final decision" for purposes of 28 U.S.C. § 1257. *Nebraska Press Association v. Stuart,* 423 U.S. 1327, 1329–30, 96 S.Ct.

251, 253–254, 46 L.Ed.2d 237 (1975) (Blackmun, J., in chambers).[15] Given this "finality" attending the state court order whose appeal would have been presented to the United States Supreme Court, and given the other circumstances, had the state case been appealed from the New Jersey courts to the Supreme Court, it could have been readily construed to fall within the exception to the finality rule recognized in the above-quoted passage from *Cox.* Therefore, I fail to see any reason why these plaintiffs stood to increase significantly their chances for access to the United States Supreme Court by attacking the Superior Court's order in federal rather than in state court.

I believe that steps (2) and (3) of the majority's argument are similarly flawed. The majority seems to have drawn the conclusion stated in step (2)—*i. e.,* that there is no reason to believe that the federal-only plaintiffs could have intervened in the state proceeding—only by choosing to ignore the rules by which New Jersey courts evaluate applications for intervention. Even if the conclusion stated in step (2) *were* accurate under existing New Jersey law, it would tend to negate, rather than support, the

**15.** *Accord, New York Times Co. v. Jascalevich,* 439 U.S. 1331, 1334, 99 S.Ct. 11, 14, 58 L.Ed.2d 38 (Marshall, J., in chambers); *cf. Moreland v. Sprecher,* 443 U.S. 709, 711, 99 S.Ct. 3086, 3088, 61 L.Ed.2d 860 (1979) (per curiam) (White and Brennan, JJ., dissenting) ("Our cases indicate that the proffered justification for an injunction against publication should be considered and verified or rejected by appellate courts without unnecessary delay."). *See also New York Times Co. v. Jascalevich,* 439 U.S. 1317, 1320–21, 99 S.Ct. 6, 9, 58 L.Ed.2d 25 (White, J., in chambers). Thus the majority errs in assuming that Supreme Court review of such a restraint is barred for lack of finality. *See* majority op. at 884 n.25. Nor is it possible to assert that reliance on Justice Blackmun's formulation in *Nebraska Press Association,* and the line of subsequent approving opinions, constitutes a "misstatement" of *Cox,* an "amendment" of a federal jurisdictional statute, or a "reading" of § 1292(a)(1) "into" § 1257—unless perhaps the majority is attempting to express its disapproval of the Supreme Court's interpretation of its own jurisdictional statutes.

However, I believe that my reading of *Cox* is supported by Judge Gibbons' own views on finality as stated in *Hoots v. Pennsylvania,* 587 F.2d 1340, 1351 (3d Cir. 1978) (Gibbons, J., dissenting). In his *Hoots* dissent, Judge Gibbons stated:

An order which has the effect of denying all relief for a violation of a constitutional

right is a final decision within the meaning of 28 U.S.C. § 1291. It is critical, therefore, to examine not only the verbal formula in the order appealed from, but the necessary effect of that order. Thus to some extent the finality and the propriety of the order are interrelated.

587 F.2d at 1352, *see also id.* at 1356 & n.11. Furthermore the Supreme Court interprets § 1257 "consistent with the pragmatic approach that we have followed in the past in determining finality" under § 1291. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 486, 95 S.Ct. at 1042 (citing *Gillespie v. United States Steel Corp.,* 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), a case interpreting § 1291); *id.* at 478 n.7, 95 S.Ct. at 1037 n.7; *id.* at 502, 95 S.Ct. at 1049 (Rehnquist, J., dissenting).

Nowhere in *San Diego Gas & Elec. Co. v. City of San Diego,* —— U.S. ——, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) do I perceive any "stress" on the "strictness of the § 1257 final judgment requirement," alluded to by the majority. Unlike the present case, *San Diego Gas* was a case where further proceedings on disputed fact issues were "necessary to resolve the federal question whether there has been a taking [and thus, a violation of the federal constitution] at all." —— U.S. at ——, 101 S.Ct. at 1294. Here, on the other hand, both the district court and this entire panel agree that some violation of the first amendment did occur.

conclusion drawn in step (3)—*i. e.*, that a *separate* 1983 action was necessary and therefore available to protect the federal-only plaintiffs from unlawful interference with constitutional rights.

Initially, I note that had the Superior Court been presented with an application for intervention and had it acted affirmatively, the Board would have been unable to show that Judge Gruccio had committed reversible error in permitting intervention. *See* N.J. Rule 4:33–2 (permissive intervention).[16] The grant of such an application could not have "unduly delay[ed] or prejudice[d] the adjudication of the rights of the original parties," even had it been filed solely for the purpose of challenging Judge Gruccio's immediate restraints on "pure" teaching. The order was not to affect the currently enrolled students until the end of the then-current term, December 22, 1979,

or about one month following the date of the injunction. Transcript of Conference before Judge Gruccio, at 12 (Nov. 21, 1979). Given the expected Christmas recess, the effect of the order on actual classroom activities could not have been felt until the beginning of the spring 1980 term. Thus there was no particular urgency in the Board's need for state-court relief that would have rendered it impracticable for the Board to defend against any fresh attack to be made by intervenors.[17]

Intervention was thus clearly permissible. More importantly, the churches, the students, the parents, and the faculty member also had an absolute right to intervene under Rule 4:33–1 (intervention as of right),[18] to the extent that their interests in the suit were (a) distinct from those of the existing defendants, and (b) affected by the state-court proceeding.[19] Ordinarily such appli-

---

**16.** Contrary to the unsupported assertion made in the majority's opinion at 882 & n.23, the right of the federal-only plaintiffs to participate in the state proceeding is governed by N.J. Rules 1:13–9 and 4:33, and is therefore significantly broader than the right of any private third party to participate in a state criminal proceeding. For in a criminal proceeding, Rule 4:33, a rule of civil practice, would be inapplicable.

**17.** I do not mean to suggest that it was clearly erroneous for the federal district court to reach the merits on grounds of the exception for "great and immediate" harm to the plaintiffs. *Younger v. Harris,* 401 U.S. at 46, 91 S.Ct. at 751. *See* minority op. at 897 n.8, *supra.* The immediacy of the harm to be suffered by the parties aligned with Shelton was of a different magnitude than the possible prejudicial delay that might have been inflicted on the Board by joinder of additional state court defendants within the brief period before the federal complaint was filed.

**18.** The rule, entitled "Intervention as of Right," states:

> Upon timely application anyone shall be permitted to intervene in an action if the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

N.J. Rule 4:33–1.

**19.** If I could agree with the majority's interpretation of *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947), majority op. at 882, I would conclude that not only the New Jersey Rules, but also the policy of § 1983, afforded

the federal-only plaintiffs grounds for insisting on the right to intervene. I believe that if federal law obligated New Jersey to provide a state forum to hear their claim, New Jersey would probably obey the federal mandate by allowing intervention, rather than a separate action, because

> [n]o injunction or restraint shall be granted in one action to stay proceedings in another pending action in the Superior Court . . ., but such relief may be sought on counterclaim or otherwise in the *pending* action.

N.J. Rule 4:52–6 (emphasis added) (contrary to the majority's suggestion at 883 n.24, I can find no support in the New Jersey cases for the blanket statement that Rule 4:52–6 "concerns *claims,* not *parties.*" *See Government Employees Ins. Co. v. Butler,* 128 N.J.Super. 492, 320 A.2d 515 (Ch.1974) (applying Rule 4:52–6 to a claim brought by a separate *party*)). Such a result would guarantee plaintiffs the opportunity to present their claims, as they bear upon the pending state litigation. It would also allow the state court to proceed on the issue before it with full cognizance of the constitutional ramifications of the relief to be ultimately awarded. In this case, of course, the district court reached differing conclusions on the *Younger* considerations applicable to the differing claims of the federal plaintiffs. *See* minority op. at 897 n.8, *supra.* In a case of this sort, the federal and state courts can each decide only so much of the case as it believes properly before it. If each court reaches a different result on the threshold question of which claims it should handle, then a possibility exists that on some claims the two may overlap; other claims may simply fall through the cracks. To allow the additional plaintiffs to intervene in the state suit would avoid the creation of such a judicial vacuum, as well as direct judicial conflict.

cations are treated liberally at the trial court level. *State v. Lanza,* 39 N.J. 595, 190 A.2d 374, 377 (1963). They cannot be denied on the grounds that the applicant has had sufficient opportunity to protect his rights by actively collaborating with counsel for existing parties. 39 N.J. 595, 190 A.2d at 376. "[O]ur courts are firmly committed to the enlightened policy which points generally to the joinder of all matters in controversy between all of the parties in a single proceeding for just and expeditious disposition at one time." *Korff v. G and G Corp.,* 21 N.J. 558, 122 A.2d 889, 893–94 (1956).

If we follow the majority's distinct interest analysis, we are asked to assume the very conclusions that demonstrate the federal-only plaintiffs had an absolute right to intervene in the state court, thus making a collateral forum unnecessary. First, the majority's argument leans heavily on the possible inadequacy of the representation by the state-court defendants of the federal-only plaintiffs' separate interests. Thus, under the majority's assumption, the federal plaintiffs fulfill one necessary predicate for obtaining intervention as of right.

Secondly, the standard for demonstrating a "practical impairment," so as to qualify for intervention as of right, is sufficiently liberal to fully guarantee the opportunity for intervention of these plaintiffs in the Superior Court, assuming that such intervention would have been at all meaningful. *See Allan-Deane Corp. v. Township of Bedminster,* 63 N.J. 591, 311 A.2d 177 (1973) (per curiam), *rev'g* 121 N.J.Super. 288, 296 A.2d 663 (App.Div.1972).[20]

Thus, contrary to the majority's view, if the federal-only plaintiffs had a legitimate

need [21] to challenge Judge Gruccio's order, a forum for such a challenge was available by intervention in the Superior Court proceeding. If New Jersey courts are presumed to evaluate applications for intervention under the applicable laws and precedents of New Jersey, then a conclusion that intervention would have been denied would prove not that a collateral forum was necessary; on the contrary, it would prove that, as a matter of fundamental fairness, availability of a collateral forum was *unnecessary.*

Such logic, irreconcilable with that adopted by the majority, is common in decisions found in related areas of the law. Unjustified failure to exercise a right to intervene can be grounds for barring any federal collateral attack on a judgment, at least where, as here, the court to which the application should have been addressed retained jurisdiction of the case. *See Black and White Children of the Pontiac School System v. School District of the City of Pontiac,* 464 F.2d 1030 (6th Cir. 1972) (per curiam) (desegregation order).[22]

In addition, the very separateness between the interests of prospective intervenors and existing parties that establishes a right to intervene also establishes, in a case such as this, that the prospective intervenors (the federal-only plaintiffs) had little to fear, in the way of direct restraints on themselves, from the entry of the Superior Court's preliminary injunction.[23] The Superior Court order only restrained "the defendants Board of Directors of Shelton College, Glenn Rogers, President of Shelton College, and Carl McIntire, Chancellor of Shelton College" from engaging in any form of educational instruction. Nothing in this order prevents the churches, parents, students, and faculty members from engag-

20. It is also worth noting, given the majority's concern that procedural stumbling blocks might prevent the New Jersey appellate courts from correcting any constitutional errors until it is too late, that in *Allan-Deane, supra,* both the Appellate Division and the New Jersey Supreme Court immediately heard an appeal from the denial of the application for intervention. *See Grober v. Kahn,* 88 N.J.Super. 343, 212 A.2d 384, 393 (App.Div.1965) (denial of an application for intervention as of right is a final order), *rev'd on other grounds,* 47 N.J. 135, 219 A.2d 601 (1966); *see generally* 3B *Moore's Federal Practice* ¶ 24.15 n.4 (1980), and cases cited there.

21. Here I am only borrowing the majority's definition of "legitimate need."

22. This rule finds its most common application in suits which amount to attacks upon consent orders. *See Oburn v. Shapp,* 70 F.R.D. 549 (E.D.Pa.), *aff'd mem.,* 546 F.2d 418 (3d Cir. 1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977); *accord, Society Hill Civic Ass'n v. Harris,* 632 F.2d 1045, 1052 (3d Cir. 1980); *Thaggard v. City of Jackson,* 618 F.2d 272 (5th Cir. 1980) (per curiam); *Prate v. Freedman,* 583 F.2d 42, 46 (2d Cir. 1978).

23. I do not mean to intimate that the federal-only plaintiffs are, for this reason, deprived of standing to obtain separate federal relief. *See* minority op. at 903 n.13, *supra.* My point here is only that the federal-only plaintiffs had no need for a separate forum in which to wage a collateral attack on the order entered by Judge Gruccio.

ing in protected activity—at least, not if, as the majority assumes, their interests can be considered distinct. For distinctiveness of interest is the test by which the perimeter of the injunctive power is defined.[24] Applicants for intervention may succeed by showing that their interests are separate from those of the existing parties, and for this very same reason, they may also show that they cannot be bound by a preliminary injunction in the case in which intervention is sought. *Teamsters Local 523 v. Keystone Freight Lines, Inc.*, 123 F.2d 326, 329–30 (10th Cir. 1941). Even the faculty member, bound by the state-court injunction as an agent of Shelton, was probably not bound if he acted in furtherance of his own first amendment interests. *Cf. Adolph Gottscho, Inc. v. Bell-Mark Corp.*, 79 N.J.Super. 156, 191 A.2d 67, 71 (Ch.1963) ("An injunction against a defendant which purports to forbid activities he carries on through employees has no bearing upon what an employee can or can not do once the employment ends.").

To assume a distinctiveness between the first amendment interests of the state-court defendants and those of the federal-only plaintiffs may be to prove that these plaintiffs would need a forum to protect themselves if threatened with prosecution. But this very distinctiveness also proves the absence of any need for a separate forum to attack the restraints on Shelton.[25] From this I can only conclude that the distinctiveness of interest highlighted by the majority reduces, rather than enlarges, the need for arming these plaintiffs with the federal injunctive weapon to attack the state court's preliminary injunction. I believe that the majority would agree with me that Judge Gruccio's preliminary injunction could not restrain the churches, parents, students and faculty member from gathering on their own initiative and engaging in a joint program of study. Under this view, the prohibition against "pure" teaching activity, which is the only restraint found by the federal district court to contravene the first amendment, could not be enforced against the federal-only plaintiffs.

I conclude that Part IV of the majority's opinion can be supported neither by precedent nor by the weight of its own logic. To

---

24. N.J. Rule 4:52–4 provides:

Every order granting an injunction ... is binding only upon such *parties to the action* and such of their officers, agents, employees, and attorneys, *and* upon such *persons in active concert or participation* with them as receive actual notice of the order by personal service or otherwise. (Emphasis added.) Nearly identical language is found in Fed.R. Civ.P. 65(d). This language is uniformly interpreted to exclude, from the class of those bound by an injunction, those individuals whose interests are distinct from, or whose acts are independent of, those directly named in the injunction. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13, 65 S.Ct. 478, 480, 89 L.Ed. 661 (1945); *In re Wholesale Licensed Alcoholic Beverage Salesmen's Union, No. 20378*, 125 N.J.Eq. 539, 6 A.2d 660, 661–62 (1939).

25. I do not mean to suggest that Shelton was not in need of such relief or that the federal court should have remitted Shelton to the state courts for such relief. Of course, had "great and immediate" irreparable harm not been present in this case, even Shelton might have been properly barred from federal relief for failure to exhaust its state-court remedies. Application to the federal courts for relief from unconstitutional state-court orders must be preceded by exhaustion of appellate avenues in the state courts. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *see Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371,

60 L.Ed.2d 994 (1979); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). This Court has held, en banc, that pursuit of discretionary leave to appeal from an interlocutory order of a New Jersey trial court is a prerequisite to satisfaction of this exhaustion requirement. *See New Jersey v. Chesimard*, 555 F.2d 63 (3d Cir. 1977) (en banc). However, these state-court defendants never sought leave to appeal. Moreover, there is no reason to believe on this record that Judge Gruccio would have failed to amend his order so as not to interfere with pure teaching, had the issue been brought to his attention or to the attention of the Appellate Division of New Jersey Superior Court. As I see the record, this issue was actually suppressed by all of the pro-Shelton litigants, in favor of a broad attack on the statutory scheme itself, until the date of the hearing before the federal district court. *See, e. g.*, Transcript of Conference before Judge Gruccio, at 10 (Nov. 21, 1979). ("I do not intend to fashion a remedy which is going to prohibit these young people from continuing the course of study."). Given the duplication of judicial effort that would have followed upon abstention on this issue, given the clearness of the merits of the issue, and given the discretionary factors that enter into the question of whether Shelton's state appellate remedies were "adequate," I see no purpose to be served by now reversing the district court on this issue. *See* minority op. at 897 n.8, *supra*.

paraphrase a recent remark by the Supreme Court, the only remaining basis for Part IV appears to be a generally framed and overbroad principle that every person asserting a federal right arising out of interlocutory injunctive relief obtained in a New Jersey state court is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises. *See Allen v. McCurry*, 449 U.S. 90, 103, 101 S.Ct. 411, 419, 66 L.Ed.2d 308 (1980).

### III.

The state-court enforcement action, and the resulting injunction, gave rise to several constitutional claims. The validity of these claims was affected in varying degrees by questions of New Jersey state law. Moreover, effective protection of the asserted federal constitutional rights required immediate action on some claims, yet not on others. For these reasons the district court was constrained to carefully weave its way among the various claims; and for the most part, it performed its task admirably. I believe, however, that the district court erred in part when it enjoined the defendants from preventing Shelton "from certifying to a student the satisfactory completion of work in a course or other educational activity *through awarding that student a credit therefor.*" (Emphasis added.)

I fully approve of the reasoning by which the district court arrived at its conclusion to abstain from deciding some of the constitutional claims addressed by the parties.[26] In particular, the court concluded that if the Board were simply seeking to prevent Shelton from granting degrees, the prerequisites for *Pullman* abstention would be met:

First, there are uncertain issues of State law underlying the Federal constitutional claims brought by Shelton College. At this point it is impossible to predict how the New Jersey Supreme Court, the ultimate arbiter of New Jersey law, will interpret the statutes and regulations governing the licensing of colleges when applied to a religious institution such as Shelton College.

Second, these State law issues could be resolved in a manner that would obviate the need to adjudicate the constitutional claims. After all, Shelton College functioned without difficulty for a number of years when it was licensed under almost identical statutes to grant degrees in New Jersey.

Third, an erroneous decision by this Court of State law might well be disruptive of New Jersey's policies which are

**26.** Unlike the majority, I cannot subscribe to the proposition that "[o]nce the court has concluded that an immediate dismissal on *Younger* grounds is inappropriate, a motion for preliminary injunctive relief, especially in first amendment contexts, ought, we think, to be considered without regard to the separate question whether a *Pullman* stay of final hearing is appropriate." Majority op. at 887. I would agree if the statement were limited to a claim for which *Younger* dismissal is inappropriate due to "great and immediate harm." I would not agree, however, if extended to apply generally to all first amendment cases in which *Younger* dismissal as to some claims is "inappropriate," and preliminary relief is "to be considered." Moreover, to the extent that it suggests that deference to *Pullman* concerns is less appropriate upon entry of a preliminary order than upon entry of a permanent order, the majority inverts the inevitable order of steps in the decision-making process. District Judge Debevoise considered only preliminary relief *because,* among other things, the perceived necessity for *Pullman* abstention prompted him to dispense with any further hearings. *See, e. g., Frederick L. v. Thomas,* 578 F.2d 513 (3d Cir. 1978) (affirming the district court's mid-litigation decision to abstain on an individual damage claim prior to adjudication of that claim). I am at a loss to understand how the absence of final federal relief in this case renders the considerations expressed in *Pullman* totally inapplicable here.

Similarly, while the presence of first amendment issues can reduce the possibility that *Pullman* abstention will be appropriate, their presence does not obviate the need to consider the policies involved in *Pullman* abstention cases generally. For instance, in *Baggett v. Bullitt,* 377 U.S. 360, 375–79, 84 S.Ct. 1316, 1324–26, 12 L.Ed.2d 377 (1964), although the Court rejected abstention on grounds that "[t]hose special circumstances" requisite to abstention "are not present here," it also noted that the "piecemeal adjudication in many courts" required by abstention is "a result quite costly where the vagueness of a state statute may inhibit the exercise of First Amendment freedoms." *See generally D'Iorio v. County of Delaware,* 592 F.2d 681, 686, 692 n.19 (3d Cir. 1978). In the present case, on the other hand, the district court found that, as to some of the constitutional claims, the requisite special circumstances *did* exist. 482 F.Supp. at 977. Under such circumstances, it was hardly incumbent upon the district court to consider preliminary relief "without regard" to these "special circumstances."

implemented by licensing institutions of higher learning.

482 F.Supp. at 977. The court then stated that

[a]n order will be entered enjoining defendants from taking ... any action having the effect or designed to have the effect of preventing Shelton College or any of its employees, servants and agents from engaging in any religious, teaching or educational activities or from publicizing or advertising such activities.

Provided that no action is taken in the pending State Court proceeding which would in any way curtail plaintiffs' rights as defined in the order mentioned above, there will be no need to enjoin the prosecution of that proceeding.

*Id.* at 979.

Although the decision made no mention of the granting of credits, the order that followed enjoined the Board from, among other things, preventing Shelton from awarding "credits" to its students. Because this part of the court's order most probably could not have been justified on the grounds provided for the rest of the federal injunction, I would reverse, but only as to this part.

The Board has attacked Shelton's degree-related activities for at least two reasons: (a) it objects to the award of degrees in New Jersey; (b) it objects to the award of credits that will be transferred toward a degree to be awarded by an out-of-state institution. One of the Board's methods for attempting to vindicate these interests was to obtain a preliminary injunction against "any form of educational instruction." The propriety of this method was fully reviewed by the district court and held to be so inconsistent with the federal constitution as to call for federal injunctive relief. Another of the Board's methods was to preliminarily enjoin the granting of degrees. This method, said the district court, was not so harmful to the constitutional rights of the federal plaintiffs as to call for such relief.

Prohibition of the granting of degrees satisfied the Board's first objection but not the second. The granting of credits in New Jersey to be used in fulfillment of Florida degree requirements would enable Shelton to circumvent New Jersey's licensing requirements. The question of whether the Board was entitled to regulate the granting of credits to be used for this purpose involved a classical *Pullman*-type question of state statutory construction. The statute provides that "[n]o corporation shall ... *participate* in conferring a degree" without a license. N.J.Stat.Ann. § 18A:68–3 (emphasis added). If this amounts to a prohibition against granting credits upon which an out-of-state institution would grant a degree, then the prohibition against granting credits gives rise to federal questions not unlike the federal questions raised by the degree-granting prohibition. On the other hand, it is possible that a limiting construction of the degree "participation" language, or other aspects of the state licensing scheme, would obviate any constitutional question. Thus, the credit issue was at least as appropriate for *Pullman* abstention as was the degree-granting issue.[27]

In addition, a potential for great and immediate harm from the state court's preliminary injunction against the award of credits was simply not disclosed in the record below. The district court made no findings at all as to the harm that would ensue from Shelton's inability to award credits, although it was required to do so. Fed.R. Civ.P. 54(a). It did, however, implicitly find that the prohibition on granting degrees did not threaten to "force the disbanding of a community of religious believers." 482 F.Supp. at 977. As the record stands on appeal, I see no reason to believe that the potential for harm resulting from a temporary inability of Shelton to award credits would have been substantially greater than the harm resulting from its temporary inability to award degrees. In the district court's view, the latter was insufficient to override the policies of *Younger.*

For these reasons I conclude that the district court may have abused its discretion when it ordered the Board to allow Shelton to continue to award "credits" to its students. In any case, the court failed to meet the requirements of Rule 52(a), thus depriving this court of an adequate record on which to affirm or reverse this portion of the order. Thus I would vacate only that part of the injunction that allowed Shelton

---

**27.** Interestingly, the majority endeavors to address this question of New Jersey law, and does so in such a way as to implicate a federal question. *See* majority op. at 887 n.29. In light of the district court's abstention from addressing this issue, it is surprising that given the policy considerations embodied in *Pullman,* this court would now undertake to address the state-law issue ab initio.

to award credits, and remand for further proceedings not inconsistent with this opinion. *See, e. g., Mayo v. Lakeland Highlands Canning Co.,* 309 U.S. 310, 316, 60 S.Ct. 517, 520, 84 L.Ed. 774 (1940); *FTC v. British Oxygen Co.,* 529 F.2d 196, 200 (3d Cir. 1976) (en banc).

### IV.

Accordingly I would affirm the district court's order in granting first amendment relief to plaintiffs, for the reasons carefully set forth by the district court in its opinion, except insofar as its order restrains the state court from barring Shelton in awarding credits to its students. As I have indicated above, I would vacate that part of the district court's injunction that allowed Shelton to award credits. Thus, I join Parts I, III, and VI B of the majority opinion but I do not join Parts II, IV, V and VI A.